# MOBIL OIL EXPLORATION & PRODUCING SOUTH-EAST, INC., ET AL. *v.* UNITED DISTRIBUTION COS. ET AL.

No. 89–1452.   Argued November 5, 1990—Decided January 8, 1991*

*Together with No. 89–1453, *Federal Energy Regulatory Commission* v. *United Distribution Cos. et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the decision of the cases.

*Rex E. Lee* argued the cause for petitioners in No. 89–1452. With him on the briefs were *Eugene R. Elrod, Carter G. Phillips, Jay G. Martin, Charles M. Darling IV, William H. Emerson, Stephen A. Herman, David G. Norrell, Mario*

*M. Garza, R. Gordon Gooch, Harris S. Wood, Harry E. Barsh, Jr., David J. Evans, Ernest J. Altgelt III, C. Roger Hoffman, Douglas W. Rasch, Toni D. Hennike, Robert C. Murray, Thomas G. Johnson, John K. McDonald, John L. Williford, Robert A. Miller, Jr., John J. Wolfe, Michael L. Pate, Thomas G. Johnson, Thomas B. Deal, Dee H. Richardson, Ernest L. Kubosh,* and *Ralph J. Pearson. Edwin S. Kneedler* argued the cause for petitioners in No. 89–1453. With him on the brief were *Solicitor General Starr, Deputy Solicitor General Wallace, William S. Scherman, Jerome M. Feit,* and *Robert H. Solomon.*

*Roberta Lee Halladay* argued the cause for respondents in both cases. With her on the brief were *Peter Buscemi, C. William Cooper,* and *Ronald D. Jones.*†

JUSTICE WHITE delivered the opinion of the Court.

These cases involve the validity of two orders, No. 451 and No. 451–A, promulgated by the Federal Energy Regulatory Commission (Commission) to make substantial changes in the national market for natural gas. On petitions for review, a divided panel of the Court of Appeals for the Fifth Circuit vacated the orders as exceeding the Commission's authority under the Natural Gas Policy Act of 1978 (NGPA), 92 Stat. 3352, 15 U. S. C. § 3301 *et seq.* 885 F. 2d 209 (1989). In light of the economic interests at stake, we granted certiorari and consolidated the cases for briefing and oral argument.

---

†Briefs of *amici curiae* urging reversal were filed for the State of New Mexico et al. by *Hal Stratton,* Attorney General of New Mexico, *Randall W. Childress,* Deputy Attorney General, and *Craig W. Hulvey, Kevin M. Sweeney,* and *George C. Garikes, Jim Mattox,* Attorney General of Texas, *William J. Guste,* Attorney General of Louisiana, and *David B. Robinson, Robert H. Henry,* Attorney General of Oklahoma, and *Joseph B. Meyer,* Attorney General of Wyoming; for the Interstate Oil Compact Commission by *Robert J. Woody, Philip F. Patman, W. Timothy Dowd,* and *Richard C. Byrd;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *Richard A. Samp.*

496 U. S. 904 (1990). For the reasons that follow, we reverse and sustain the Commission's orders in their entirety.

I

The Natural Gas Act of 1938 (NGA), 52 Stat. 821, 15 U. S. C. § 717 *et seq.*, was Congress' first attempt to establish nationwide natural gas regulation. Section 4(a) mandated that the present Commission's predecessor, the Federal Power Commission,[1] ensure that all rates and charges requested by a natural gas company for the sale or transportation of natural gas in interstate commerce be "just and reasonable." 15 U. S. C. § 717c(a). Section 5(a) further provided that the Commission order a "just and reasonable rate, charge, classification, rule, regulation, practice, or contract" connected with the sale or transportation of gas whenever it determined that any of these standards or actions were "unjust" or "unreasonable." 15 U. S. C. § 717d(a).

Over the years the Commission adopted a number of different approaches in applying the NGA's "just and reasonable" standard. See *Public Serv. Comm'n of N. Y.* v. *Mid-Louisiana Gas Co.*, 463 U. S. 319, 327–331 (1983). Initially the Commission, construing the NGA to regulate gas sales only at the downstream end of interstate pipelines, proceeded on a company-by-company basis with reference to the historical costs each pipeline operator incurred in acquiring and transporting gas to its customers. The Court upheld this approach in *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591 (1944), explaining that the NGA did not bind the Commission to "any single formula or combination of formulae in determining rates." *Id.*, at 602.

The Commission of necessity shifted course in response to our decision in *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672 (1954). *Phillips* interpreted the NGA to require that the Commission regulate not just the downstream rates

---

[1] The term "Commission" will refer to both the Federal Energy Regulatory Commission and its predecessor, the Federal Power Commission.

charged by large interstate pipeline concerns, but also up-stream sales rates charged by thousands of independent gas producers. *Id.*, at 682. Faced with the regulatory burden that resulted, the Commission eventually opted for an "area rate" approach for the independent producers while retaining the company-by-company method for the interstate pipelines. First articulated in 1960, the area rate approach established a single rate schedule for all gas produced in a given region based upon historical production costs and rates of return. See *Statement of General Policy No. 61–1*, 24 F. P. C. 818 (1960). Each area rate schedule included a two-tiered price ceiling: the lower ceiling for gas prices established in "old" gas contracts and a higher ceiling for gas prices set in "new" contracts. *Id.*, at 819. The new two-tiered system was termed "vintage pricing" or "vintaging." Vintaging rested on the premise that the higher ceiling price for new gas production would provide incentives that would be superfluous for old gas already flowing because "price could not serve as an incentive, and since any price above average historical costs, plus an appropriate return, would merely confer windfalls." *Permian Basin Area Rate Cases*, 390 U. S. 747, 797 (1968). The balance the Commission hoped to strike was the development of gas production through the "new" gas ceilings while ensuring continued protection of consumers through the "old" gas price limits. At the same time the Commission anticipated that the differences in price levels would be "reduced and eventually eliminated as subsequent experience brings about revisions in the prices in the various areas." *Statement of General Policy, supra*, at 819. We upheld the vintage pricing system in *Permian Basin*, holding that the courts lacked the authority to set aside any Commission rate that was within the "'zone of reasonableness.'" 390 U. S., at 797 (citation omitted).

By the early 1970's, the two-tiered area rate approach no longer worked. Inadequate production had led to gas shortages which in turn had prompted a rapid rise in prices. Ac-

cordingly, the Commission abandoned vintaging in favor of a single national rate designed to encourage production. *Just and Reasonable National Rates for Sales of Natural Gas*, 51 F. P. C. 2212 (1974). Refining this decision, the Commission prescribed a single national rate for all gas drilled after 1972, thus rejecting an earlier plan to establish different national rates for succeeding biennial vintages. *Just and Reasonable National Rates for Sales of Natural Gas*, 52 F. P. C. 1604, 1615 (1974). But the single national pricing scheme did not last long either. In 1976 the Commission reinstated vintaging with the promulgation of Order No. 770. *National Rates for Jurisdictional Sales of Natural Gas*, 56 F. P. C. 509. At about the same time, in Order No. 749, the Commission also consolidated a number of the old vintages for discrete areas into a single nationwide category for all gas already under production before 1973. *Just and Reasonable National Rates for Sales of Natural Gas*, 54 F. P. C. 3090 (1975), aff'd *sub nom. Texaco Oil Co.* v. *FERC*, 571 F. 2d 834 (CA5), cert. dism'd, 439 U. S. 801 (1978). Despite this consolidation, the Commission's price structure still contained 15 different categories of old gas, each with its own ceiling price. Despite all these efforts, moreover, severe shortages persisted in the interstate market because low ceiling prices for interstate gas sales fell considerably below prices the same gas could command in intrastate markets, which were as yet unregulated.

Congress responded to these ongoing problems by enacting the NGPA, the statute that controls this controversy. See *Mid-Louisiana Gas Co.*, *supra*, at 330–331. The NGPA addressed the problem of continuing shortages in several ways. First, it gave the Commission the authority to regulate prices in the intrastate market as well as the interstate market. See *Transcontinental Gas Pipe Line Corp.* v. *State Oil and Gas Bd. of Miss.*, 474 U. S. 409, 420–421 (1986) *(Transco)*. Second, to encourage production of new reserves, the NGPA established higher price ceilings for new

and hard-to-produce gas as well as a phased deregulation scheme for these types of gas. §§ 102, 103, 105, 107 and 108; 15 U. S. C. §§ 3312, 3313, 3315, 3317, 3318. Finally, to safeguard consumers, §§ 104 and 106 carried over the vintage price ceilings that happened to be in effect for old gas when the NGPA was enacted while mandating that these be adjusted for inflation. 15 U. S. C. §§ 3314 and 3316. Congress, however, recognized that some of these vintage price ceilings "may be too *low* and authorize[d] the Commission to raise [them] whenever traditional NGA principles would dictate a higher price." *Mid-Louisiana Gas*, 463 U. S., at 333. In particular, §§ 104(b)(2) and 106(c) provided that the Commission "may, by rule or order, prescribe a maximum lawful ceiling price, applicable to any first sale of any natural gas (or category thereof, as determined by the Commission) otherwise subject to the preceding provisions of this section." 15 U. S. C. §§ 3314(b)(2) and 3316(c). The only conditions that Congress placed on the Commission were, first, that the new ceiling be higher than the ceiling set by the statute itself and, second, that it be "just and reasonable" within the meaning of the NGA. §§ 3314(b)(1), 3316(a).

The new incentives for production of new and hard-to-produce gas transformed the gas shortages of the 1970's into gas surpluses during the 1980's. One result was serious market distortions. The higher new gas price ceilings prevented the unexpected oversupply from translating into lower consumer prices since the lower, vintage gas ceilings led to the premature abandonment of old gas reserves. App. 32–36. Accordingly, the Secretary of Energy in 1985 formally recommended that the Commission issue a notice of proposed rulemaking to revise the old gas pricing system. 50 Fed. Reg. 48540 (1985). After conducting two days of public hearings and analyzing approximately 113 sets of comments, the Commission issued the two orders under dispute in this case: Order No. 451, promulgated in June 1986, 51 Fed. Reg. 22168 (1986); and Order No. 451–A, promulgated

in December 1986, which reaffirmed the approach of its predecessor while making certain modifications.[2] 51 Fed. Reg. 46762 (1986).

The Commission's orders have three principal components. First, the Commission collapsed the 15 existing vintage price categories of old gas into a single classification and established an alternative maximum price for a producer of gas in that category to charge, though only to a willing buyer. The new ceiling was set at $2.57 per million Btu's, a price equal to the highest of the ceilings then in effect for old gas (that having the most recent, post-1974, vintage) adjusted for inflation. 51 Fed. Reg. 22183–22185 (1986); see 18 CFR § 271.402(c)(3)(iii) (1986). When established the new ceiling exceeded the then-current market price for old gas. The Commission nonetheless concluded that this new price was "just and reasonable" because, among other reasons, it generally approximated the replacement cost of gas based upon the current cost of finding new gas fields, drilling new wells, and producing new gas. See *Shell Oil Co.* v. *FPC*, 520 F. 2d 1061 (CA5 1975) (holding that replacement cost formula appropriate for establishing "just and reasonable" rates under the NGA), cert. denied, 426 U. S. 941 (1976). In taking these steps, the Commission noted that the express and unambiguous terms of §§ 104(b)(2) and 106(c) gave it specific authorization to raise old gas prices so long as the resulting ceiling met the just and reasonable requirement. 51 Fed. Reg., at 22179.

The second principal feature of the orders establishes a "Good Faith Negotiation" (GFN) procedure that producers must follow before they can collect a higher price from current pipeline customers. 18 CFR § 270.201 (1986). The GFN process consists of several steps. Initially, a producer may request a pipeline to nominate a price at which the pipeline would be willing to continue purchasing old gas under

---

[2] Order No. 451 shall refer to both orders where the distinction is not relevant.

any existing contract. § 270.201(b)(1). At the same time, however, this request is also deemed to be an offer by the producer to release the purchaser from *any* contract between the parties that covers the sale of old gas. § 270.201(b)(4). In response, the purchaser can both nominate its own price for continuing to purchase old gas under the contracts specified by the purchaser and further request that the producer nominate a price at which the producer would be willing to continue selling any gas, old or new, covered under any contracts specified by the purchaser that cover at least some old gas. If the parties cannot come to terms, the producer can either continue sales at the old price under existing contracts or abandon its existing obligations so long as it has executed a new contract with another purchaser and given its old customer 30 days' notice. §§ 157.301, 270.201(c)(1), (e)(4). The Commission's chief rationale for the GFN process was a fear that automatic collection of the new price by producers would lead to market disruption given the existence of numerous gas contracts containing indefinite price-escalation clauses tied to whatever ceiling the agency established. 51 Fed. Reg., at 22204. The Commission further concluded that NGA § 7(b), which establishes a "due hearing" requirement before abandonments could take place, did not prevent it from promulgating an across-the-board rule rather than engage in case-by-case adjudication. 15 U. S. C. § 717f(b).

Finally, the Commission rejected suggestions that it undertake completely to resolve the issue of take-or-pay provisions in certain natural gas contracts in the same proceeding in which it addressed old gas pricing.[3] The Commission explained that it was already addressing the take-or-pay problem in its Order No. 436 proceedings. It further pointed out that the GFN procedure, in allowing the purchaser to propose new higher prices for old gas in return for renegotiation of take-or-pay obligations, would help resolve many take-or-

---

[3] A take-or-pay clause requires a purchasing pipeline to take a specified volume of gas from a producer or, if it is unable to do so, to pay for the specified volume. See *Transco*, 474 U. S. 409, 412 (1986).

pay disputes. The Commission also reasoned that the expansion of old gas reserves resulting from its orders would reduce new gas prices and thus reduce the pipelines' overall take-or-pay exposure. 51 Fed. Reg., at 22174–22175, 22183, 22196–22197, 46783–46784.

A divided panel of the Court of Appeals for the Fifth Circuit vacated the orders on the ground that the Commission had exceeded its statutory authority. The court first concluded that Congress did not intend to give the Commission the authority to set a single ceiling price for old gas under §§ 104(b)(2) and 106(c). The court also dismissed the ceiling price itself as unreasonable since it was higher than the spot market price when the orders were issued and so amounted to "de facto deregulation." 885 F. 2d, at 218–222. Second, the court rejected the GFN procedure on the basis that the Commission lacked the authority to provide for across-the-board, preauthorized abandonment under § 7(b). *Id.*, at 221–222. Third, the court chided the Commission for failing to seize the opportunity to resolve the take-or-pay issue, although it did acknowledge that the Commission was addressing that matter on remand from the District of Columbia Circuit's decision in *Associated Gas Distributors* v. *FERC*, 263 U. S. App. D. C. 1, 824 F. 2d 981 (1987), cert. denied, 485 U. S. 1006 (1988). The dissent disagreed with all three conclusions, observing that the majority should have deferred to the Commission as the agency Congress delegated to regulate natural gas. 885 F. 2d, at 226–235 (Brown, J., dissenting). We granted certiorari, 496 U. S. 904 (1990), and now reverse and sustain the Commission's orders.

## II

Section 104 (a) provides that the maximum price for old gas should be computed as provided in § 104(b).[4] The general

---

[4] Section 104 in its entirety reads:

"Ceiling price for sales of natural gas dedicated to interstate commerce.

"(a) Application. — In the case of natural gas committed or dedicated to interstate commerce on [November 8, 1978,] and for which a just and reasonable rate under the Natural Gas Act [15 U. S. C. § 717 et seq.] was in

rule under § 104(b)(1) is that each category of old gas would be priced as it was prior to the enactment of the NGPA, but increased over time in accordance with an inflation formula. This was the regime that obtained under the NGPA until the issuance of the orders at issue here. Section 104(b)(2), however, plainly gives the Commission authority to change this regulatory scheme applicable to old gas:

> "The Commission may, by rule or order, prescribe a maximum lawful ceiling price, applicable to any first sale

---

effect on such date for the first sale of such natural gas, the maximum lawful price computed under subsection (b) shall apply to any first sale of such natural gas delivered during any month.

"(b) Maximum lawful price.—

"(1) General rule.—The maximum lawful price under this section for any month shall be the higher of—

"(A)(i) the just and reasonable rate, per million Btu's, established by the Commission which was (or would have been) applicable to the first sale of such natural gas on April 20, 1977, in the case of April 1977; and

"(ii) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this subparagraph for the preceding month multiplied by the monthly equivalent of the annual inflation adjustment factor applicable for such month, or

"(B) any just and reasonable rate which was established by the Commission after April 27, 1977, and before [November 9, 1978,] and which is applicable to such natural gas.

"(2) Ceiling prices may be increased if just and reasonable.—The Commission may, by rule or order, prescribe a maximum lawful ceiling price, applicable to any first sale of any natural gas (or category thereof, as determined by the Commission) otherwise subject to the preceding provisions of this section, if such price is—

"(A) higher than the maximum lawful price which would otherwise be applicable under such provisions; and

"(B) just and reasonable within the meaning of the Natural Gas Act [15 U. S. C. 717 et seq.]."

Section 106(c) deals in almost identical language with the ceiling prices for sales under "rollover" contacts, which the NGPA defines as contracts entered into on or after November 8, 1978, for the first sale of natural gas that was previously subject to a contract that expired at the end of a fixed term specified in the contract itself. 15 U. S. C. § 3301(12). A reference to § 104(b)(2) is here used to refer to both provisions.

of any natural gas (or category thereof, as determined by the Commission) otherwise subject to the preceding provisions of this section, if such price is —

"(A) higher than the maximum lawful price which would otherwise be applicable under such provisions; and

"(B) just and reasonable within the meaning of the Natural Gas Act [15 U. S. C. 717 et seq.]." 15 U. S. C. §§ 3314(b)(2) and 3316(c).

Nothing in these provisions prevents the Commission from either increasing the ceiling price for multiple old gas vintages or from setting the ceiling price applicable to each vintage at the same level. To the contrary, the statute states that the Commission may increase the ceiling price for *"any* natural gas *(or category thereof, as determined by the Commission)."* (Emphasis added.) Likewise, § 104(b)(2) allows the Commission to "prescribe *a* ceiling price" applicable to any natural gas category. Insofar as "any" encompasses "all," this language enables the Commission to set a single ceiling price for every category of old gas. As we have stated in similar contexts, "[i]f the statute is clear and unambiguous, 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Sullivan* v. *Stroop*, 496 U. S. 478, 482 (1990) (quoting *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988)).

Respondents counter that the structure of the NGPA points to the opposite conclusion. Specifically, they contend that Congress could not have intended to allow the Commission to collapse all old gas vintages under a single price where the NGPA created detailed incentives for new and hard-to-produce gas on one hand, yet carefully preserved the old gas vintaging scheme on the other. Brief for Respondents 33–37. We disagree. The statute's bifurcated approach implies no more than that Congress found the need to encourage new gas production sufficiently pressing to deal with the

matter directly, but was content to leave old gas pricing within the discretion of the Commission to alter as conditions warranted. The plain meaning of § 104(b)(2) confirms this view.

Further, the Commission's decision to set a single ceiling fully accords with the two restrictions that the NGPA does establish. With respect to the first, the requirement that a ceiling price be "higher than" the old vintage ceilings carried over from the NGA does nothing to prevent the Commission from consolidating existing categories and setting one price equivalent to the highest previous ceiling. 15 U. S. C. §§ 3314(b)(2)(A) and 3316(c)(1). With respect to the second, collapsing the old vintages also comports with the mandate that price ceilings be "just and reasonable within the meaning of the Natural Gas Act." 15 U. S. C. §§ 3314(b)(2)(B) and 3316(c)(2).

Far from binding the Commission, the "just and reasonable" requirement accords it broad ratemaking authority that its decision to set a single ceiling does not exceed. The Court has repeatedly held that the just and reasonable standard does not compel the Commission to use any single pricing formula in general or vintaging in particular. *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 602 (1944); *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 586 (1942); *Permian Basin*, 390 U. S., at 776–777; *FPC* v. *Texaco Inc.*, 417 U. S. 380, 386–389 (1974); *Mobil Oil Corp.* v. *FPC*, 417 U. S. 283, 308 (1974). Courts of Appeals have also consistently affirmed the Commission's use of a replacement-cost-based method under the NGA. *E. g.*, *Shell Oil Co.* v. *FPC*, 520 F. 2d 1061, 1082–1083 (CA5 1975), cert. denied, 426 U. S. 941 (1976); *American Public Gas Assn.* v. *FPC*, 567 F. 2d 1016, 1059 (CADC 1977), cert. denied, 435 U. S. 907 (1978). By incorporating the "just and reasonable" standard into the NGPA, Congress clearly meant to preserve the pricing flexibility the Commission had historically exercised under the

NGA. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 378–382 (1982). In employing a replacement cost formula, the Commission did no more than what it had previously done under the NGA: collapse vintage categories together because the replacement cost for natural gas is the same regardless of when it was placed in production. See Order No. 749, *Just and Reasonable National Rates for Sales of Natural Gas*, 54 F. P. C. 3090 (1975).[5]

Respondents contend that even if the statute allows the Commission to set a single old gas ceiling, the particular ceiling it has set is unjustly and impermissibly high. They first argue that the Commission conceded that actual collection of the new price would not be just and therefore established the GFN procedures as a requisite safeguard. The Commission correctly denies having made any such concession. In its orders, in its briefs, and at oral argument, the agency has been at pains to point out that its ceiling price, which was no higher than the highest of the ceilings then applicable to old gas, falls squarely within the "zone of reasonableness" mandated by the NGA. See *Permian Basin, supra*, at 767. What the agency has acknowledged is that automatic collection of prices up to the ceiling under the escalator clauses common to industry contracts would produce "inappropriate" market distortion, especially since the market price remains below the ceiling. Reply Brief for Petitioner in No. 89–1453, p. 12. In consequence the Commission instituted the GFN process to mitigate too abrupt a transition from one pricing regime to the next. Respondents have not sought to challenge (and we do not today consider) the Commission's au-

---

[5] Even had we concluded that §§ 104(b)(2) and 106(c) failed to speak unambiguously to the ceiling price question, we would nonetheless be compelled to defer to the Commission's interpretation. It follows from our foregoing discussion that the agency's view cannot be deemed arbitrary, capricious, or manifestly contrary to the NGPA. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844 (1984); *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 292 (1988).

thority to require this process, but they assert that the requiring of it amounts to an acknowledgment by the Commission that the new ceiling price is in fact unreasonable. We disagree. There is nothing incompatible between the belief that a price is reasonable and the belief that it ought not to be imposed without prior negotiations. We decline to disallow an otherwise lawful rate because additional safeguards accompany it.

We likewise reject respondents' more fundamental objection that no order "deregulating" the price of old gas can be deemed just and reasonable. The agency's orders do not deregulate in any legally relevant sense. The Commission adopted an approved pricing formula, set a maximum price, and expressly rejected proposals that it truly deregulate by eliminating any ceiling for old gas whatsoever. App. 170–171. Nor can we conclude that deregulation results simply because a given ceiling price may be above the market price. *United Gas Pipe Line Co.* v. *Mobile Gas Serv. Corp.*, 350 U. S. 332, 343 (1956); *FPC* v. *Sierra Pacific Power Co.*, 350 U. S. 348, 353 (1956); *FPC* v. *Texaco Inc.*, 417 U. S. 380, 397 (1974).

## III

We further hold that Order No. 451's abandonment procedures fully comport with the requirements set forth in § 7(b) of the NGA. 15 U. S. C. § 717f(b). In particular, we reject the suggestion that this provision mandates individualized proceedings involving interested parties before a specific abandonment can take place.

Section 7(b), which Congress retained when enacting the NGPA, states:

> "No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available sup-

ply of natural gas is depleted to the extent that the con-
tinuance of service is unwarranted, or that the present
or future public convenience or necessity permit such
abandonment." 15 U. S. C. § 717f(b).

As applied to this case § 7(b) prohibits a producer from aban-
doning its contractual service obligations to the purchaser un-
less the Commission has, first, granted its "permission and
approval" of the abandonment; second, made a "finding" that
"present or future public convenience or necessity permit
such abandonment"; and, third, held a "hearing" that is
"due." The Commission has taken each of these steps.

First, Order No. 451 permits and approves the abandon-
ment at issue. That approval is not specific to any single
abandonment but is instead general, prospective, and condi-
tional. These conditions include: failure by the purchaser
and producer to agree to a revised price under the GFN pro-
cedures; execution of a new contract between the producer
and a new purchaser; and 30-days' notice to the previous
purchaser of contract termination. 18 CFR § 270.201(c)(1)
(1986). Neither respondents nor the Court of Appeals hold-
ing directly questions the Commission's orders for failing to
satisfy this initial requirement. As we have previously held,
nothing in § 7(b) prevents the Commission from giving ad-
vance approval of abandonment. *FPC* v. *Moss*, 424 U. S.
494, 499–502 (1976). See *Permian Basin*, 390 U. S., at 776.

Second, the Commission also made the necessary findings
that "present or future public interest or necessity" allowed
the conditional abandonment that it prescribed. 51 Fed.
Reg., at 46785–46787. Reviewing "all relevant factors in-
volved in determining the overall public interest," the Com-
mission found that preauthorized abandonment under the
GFN regime would generally protect purchasers by allowing
them to buy at market rates elsewhere if contracting produc-
ers insisted on the new ceiling price; safeguard producers by
allowing them to abandon service if the contracting purchaser
fails to come to terms; and serve the market by releasing pre-

viously unused reserves of old gas. See *Felmont Oil Corp. and Essex Offshore, Inc.*, 33 FERC ¶ 61,333, p. 61,657 (1985), rev'd on other grounds *sub nom. Consolidated Edison Co. of N. Y.* v. *FERC*, 262 U. S. App. D. C. 222, 823 F. 2d 630 (1987). At bottom these findings demonstrate the agency's determination that the GFN conditions make certain matters common to all abandonments. Contrary to respondents' theory, § 7(b) does not compel the agency to make "specific findings" with regard to every abandonment when the issues involved are general. As we held in the context of disability proceedings under the Social Security Act, "general factual issue[s] may be resolved as fairly through rulemaking" as by considering specific evidence when the questions under consideration are "not unique" to the particular case. *Heckler* v. *Campbell*, 461 U. S. 458, 468 (1983).

Finally, it follows from the foregoing that the Commission discharged its § 7(b) duty to hold a "due hearing." Before promulgating Order No. 451, the agency held both a notice and comment hearing and an oral hearing. As it correctly concluded, § 7(b) required no more. Time and again, "[t]he Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration." *Heckler* v. *Campbell, supra,* at 467; *Permian Basin, supra,* at 774–777; *FPC* v. *Texaco Inc.*, 377 U. S. 33, 41–44 (1964); *United States* v. *Storer Broadcasting Co.*, 351 U. S. 192, 205 (1956). The Commission's approval conditions establish, and its findings confirm, that the abandonment at issue here is precisely the type of issue in which "[a] contrary holding would require the agency continually to relitigate issues that may be established fairly and efficiently in a single rulemaking proceeding." *Heckler* v. *Campbell, supra,* at 467. See *Panhandle Eastern Pipe Line Co.* v. *FERC*, 285 U. S. App. D. C. 115, 907 F. 2d 185, 188 (1990); *Kansas Power & Light Co.* v.

*FERC*, 271 U. S. App. D. C. 252, 256–259, 851 F. 2d 1479, 1483–1486 (1988); *Associated Gas Distributors* v. *FERC*, 263 U. S. App. D. C. 1, 35, n. 17, 824 F. 2d 981, 1015, n. 17 (1987), cert. denied, 485 U. S. 1006 (1988).

Neither the Court of Appeals nor respondents have uncovered a convincing rationale for holding otherwise. Relying on *United Gas Pipe Line Co.* v. *McCombs*, 442 U. S. 529 (1979), the panel majority held that Order No. 451's prospective approval of abandonment was impermissible given the "practical" control the GFN process afforded producers. 885 F. 2d, at 221–223. *McCombs*, however, is inapposite since that case dealt with a producer who attempted to abandon with no Commission approval, finding, or hearing whatsoever. Nor can respondents object that the Commission made no provision for individual determinations under its abandonment procedures where appropriate. Under Order No. 451, a purchaser who objects to a given abandonment on the grounds that the conditions the agency has set forth have not been met may file a complaint with the Commission. See 18 CFR § 385.206 (1986).

## IV

We turn, finally, to the problem of "take-or-pay" contracts. A take-or-pay contract obligates a pipeline to purchase a specified volume of gas at a specified price and, if it is unable to do so, to pay for that volume. A plausible response to the gas shortages of the 1970's, this device has created significant dislocations in light of the oversupply of gas that has occurred since. Today many purchasers face disastrous take-or-pay liability without sufficient outlets to recoup their losses. The Court of Appeals cited this problem as a further reason for invalidating Order No. 451. Specifically, the court chastised the Commission for its "regrettable and unwarranted" failure to address the take-or-pay problem in the rulemaking under consideration. 885 F. 2d, at 224.

Exactly what the court held, however, is another matter. The dissent viewed the majority's discussion as affirmatively

ordering the Commission "once and for all to *solve*" the entire take-or-pay issue. 885 F. 2d, at 234 (Brown, J., dissenting). Respondents more narrowly characterize the holding as that the Commission should have addressed the take-or-pay problem at least to the extent that Order No. 451 exacerbated it. Brief for Respondents 67–70. We have no need to choose between these interpretations because the Court of Appeals erred under either view.

The court clearly overshot the mark if it ordered the Commission to resolve the take-or-pay problem in this proceeding. An agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures, *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519 (1978), and priorities, *Heckler* v. *Chaney*, 470 U. S. 821, 831–832 (1985). We have expressly approved an earlier Commission decision to treat the take-or-pay issue separately where a different proceeding would generate more appropriate information and where the agency was addressing the question. *FPC* v. *Sunray DX Oil Co.*, 391 U. S. 9, 49–51 (1968). The record in this case shows that approximately two-thirds of existing take-or-pay contracts do not involve old gas. We are satisfied that the agency could compile relevant data more effectively in a separate proceeding. We are likewise satisfied that "the Commission itself has taken steps to alleviate take-or-pay problems." *Id.*, at 50. In promulgating Order No. 451, the agency explained that it had chosen not to deal with the take-or-pay matter directly primarily because it was addressing the matter on remand from the D. C. Circuit. *Associated Gas Distributors* v. *FERC, supra.*[6]

---

[6] The Court of Appeals for the D. C. Circuit has since invalidated the Commission's principal attempt at solving the problem. *Associated Gas Distributors* v. *FERC*, 283 U. S. App. D. C. 265, 899 F. 2d 1250 (1990). See also *American Gas Assn.* v. *FERC*, 286 U. S. App. D. C. 142, 912 F. 2d 1496 (1990) (approving other aspects of the Commission's take-or-pay proceedings), cert. pending *sub nom. Willcox* v. *FERC*,

The court likewise erred if it meant that the Commission should have addressed the take-or-pay problem insofar as Order No. 451 "exacerbated" it. This rationale does not provide a basis for invalidating the Commission's orders. As noted, an agency need not solve every problem before it in the same proceeding. This applies even where the initial solution to one problem has adverse consequences for another area that the agency was addressing. See *Vermont Yankee*, *supra*, at 543–544 (agencies are free to engage in multiple rulemaking "[a]bsent constitutional constraints or extremely compelling circumstances"). Moreover, the agency articulated rational grounds for concluding that Order No. 451 would do more to ameliorate the take-or-pay problem than worsen it. 51 Fed. Reg., at 22196, 46783–46784. The agency reasoned that the GFN procedures would encourage the renegotiation of take-or-pay provisions in contracts involving the sale of old gas or old gas and new gas together. *Id.*, at 22196–22197. The agency further noted that the release of old gas would reduce the market price for new gas and thus reduce the pipelines' aggregate liability. We are neither inclined nor prepared to second-guess the agency's reasoned determination in this complex area. See *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983).

V

We disagree with the Court of Appeals that the Commission lacked the authority to set a single ceiling price for old gas; possessed no power to authorize conditional preauthorized abandonment of producers' obligations to provide old gas; or had a duty to address the take-or-pay problem more fully in this proceeding. Accordingly, we reverse the judg-

No. 90–806. Nothing in our holding today precludes interested parties from petitioning the Commission for further rulemaking should it become apparent that the agency is no longer addressing the take-or-pay problem. See *Panhandle Eastern Pipe Line Co.* v. *FERC*, 281 U. S. App. D. C. 318, 890 F. 2d 435 (1989).

ment of the Court of Appeals and sustain Orders Nos. 451 and 451–A in their entirety.

*So ordered.*

JUSTICE KENNEDY took no part in the decision of these cases.