**NORTHERN BORDER PIPELINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Natural Gas Pipeline Company of America, Intervenor.**

Nos. 96–1442, 96–1444.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1997.

Decided Dec. 2, 1997.

---

Mark F. Sundback, Washington, DC, argued the cause for petitioners, with whom Peter J. Thompson, Paul Korman, and Philip R. Telleen were on the briefs.

Patricia L. Weiss, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor, were on the brief.

Before: SILBERMAN, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Northern Border Pipeline Company and Natural Gas Pipeline Company of America petition for review of orders of the Federal Energy Regulatory Commission directing Northern Border to record the cost of a gas pipeline facility it had purchased from Natural in accordance with FERC's Uniform System of Accounts. We deny the petition.

**I.**

In the late 1980s, Northern Border and Natural each considered building a pipeline to connect the end of Northern Border's system in Ventura, Iowa to an existing Natural line near Harper, Iowa. This direct link was important because it would allow Northern Border to deliver gas directly to Natural facilities, bypassing pipelines operated by a third company, thereby avoiding an additional charge to reach Natural's line. Natural began construction on its version of this project in June of 1990. Northern Border then dropped its own plan and instead reached agreement with Natural to purchase the new line. Natural placed the line into service on January 18, 1991, and thereafter successfully applied to FERC for a certificate of public convenience to operate it under Section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c) (1994).

Northern Border, pursuant to the purchase agreement, sought the Commission's permission to buy and operate the line. Following a proceeding at which Northern Border's customers were provided with an opportunity to comment on the proposed transaction, FERC approved Northern Border's application to purchase the line from Natural for approximately $78 million—a price that reflected the amount it had cost Natural to construct the facility—and granted the company its own Section 7(c) certificate to operate the line. The sale was consummated on November 1, 1992, approximately 20 months after the line had

entered into service. As required, both Northern Border and Natural submitted their accounting journal entries for the purchase and sale of the line to FERC's Chief Accountant. Natural's proposed entries reflected a gain of $3,092,388 on the sale, the amount it recorded as accumulated depreciation for the 20 months the line had been in operation at the time of the sale. But Northern Border did not record any accumulated depreciation in its submission.

The specific accounting procedures governing a natural gas company's purchase of an existing gas facility are found in Gas Plant Instruction No. 5 of the Commission's Uniform System of Accounts. 18 C.F.R. pt. 201, at 526–27 (1997). A company must record the cost of acquiring a facility in a number of steps, one of which is to transfer the depreciation applicable to the original cost of the facility to a separate account, "Accumulated Provision For Depreciation of Gas Utility Plant." Northern Border, despite its acknowledgment that the line had depreciated by approximately $3 million at the time of the purchase, did not transfer any accumulated depreciation.

The Commission, affirming its Chief Accountant, determined that Northern Border had violated its rules and directed petitioner to comply. This is not just a technical bookkeeping dispute; the Commission points out that Northern Border's failure to comply with the Uniform System resulted in its customers paying immediately higher rates. Most companies charge customers according to a "stated rate" tariff, a specific numeric rate approved by FERC. Northern Border, however, charges its customers according to a formula tariff. This means that Northern Border's rate is automatically calculated by a FERC-approved formula, which includes the specific cost elements on which charges to customers will be based. This ratebase includes capital expenditures for facility acquisition. Because Northern Border failed to record the accumulated depreciation, according to the Commission the company overstated its ratebase by approximately $3 million, which, in turn raised Northern Border's rates higher than they would have been had the company complied with the Uniform Sys-

tem.[1] FERC, therefore, ordered Northern Border to refund this overcharge to its customers.

## II.

■ The concept of original cost accounting is a bedrock principle of the Uniform System. Original cost accounting rests on the notion that the purchaser of a facility simply inherits the previous owner's "claims to a return of and on the capital originally devoted to the public service." *United Gas Pipe Line Co.*, 25 F.P.C. 26, 64 (1961), *rev'd and remanded on other grounds sub nom. Willmut Gas and Oil Co. v. FPC*, 299 F.2d 111 (D.C.Cir.1962). In this case, it required Northern Border to report the purchased facility's depreciated original cost, defined as the cost to Natural less accumulated depreciation. Under FERC's ratemaking policies, a natural gas company's rates are tied to its capital investment in facilities used for service. Absent original cost accounting, "all that pipelines would have to do to raise rates and obtain greater income would be to buy utility properties from another at a price higher than original cost and in this very simple way increase the cost of service to consumers." *Arkla Energy Resources*, 61 F.E.R.C. ¶ 61,004, at 61,038, 1992 WL 424016 (1992). A company, however, is not always prohibited from recovering that amount of the purchase price in excess of depreciated original cost. It can do so by proving that "consumer benefits relative to the excess amount [paid] accrued to rate payers." *United Gas Pipe Line*, 25 F.P.C. at 63. This is known as the *United* test.

■ Northern Border puts to us three grounds supporting its claim that FERC's orders are arbitrary and capricious. First, the company argues—quite implausibly— that its proposed accounting entries actually comply with the Uniform System. The Commission's Gas Plant Instruction No. 5B(2) requires the recording of a facility's depreciation in a separate account if "applicable to the original cost of the properties purchased." 18 C.F.R. pt. 201, at 526 (1997).

Northern Border contends that the line's depreciation from the time it entered into service until the sale was consummated is somehow "not applicable" to the original cost of the line because Natural had never recovered such depreciation costs from its ratepayers. FERC had approved Natural's proposal to offer service on the line without adding the line's cost to its ratebase (the net value of a utility's investment upon which it is permitted to earn a rate of return).

■ FERC, however, does not interpret its own regulations to link the "applicability" of a purchased facility's depreciation to the question of whether the facility's previous owner has recovered any depreciation from its customers. If the facility has depreciated below its original cost, that is enough to require a separate recording of that depreciation. Since "[w]e afford substantial deference to the Commission's interpretations of its own regulations, deferring to the agency unless its interpretation 'is plainly erroneous or inconsistent with the regulation[s],'" *Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1292 (D.C.Cir.1996) (citations omitted), we see nothing unreasonable in FERC's rather straightforward reading of its own Gas Plant Instruction.

■ Second, and more fundamental to petitioner's challenge, the company asserts that it has demonstrated conclusively that the acquisition of the line passed the *United* test by affording benefits to consumers. Had Northern Border constructed an alternative to the line, it is argued that it would have cost $12–22 million more than the $78 million purchase price. And, in deciding whether to approve the company's application to purchase and operate the line, FERC found that Northern Border's purchase would reduce rates on the entire Northern Border pipeline system by approximately eight percent. *Northern Border Pipeline Co.*, 58 F.E.R.C.¶ 61,085, at 61,305 (1992). The line, we are also reminded, allows Northern Border's shippers to reach Natural's system di-

---

**1.** Northern Border plugged the entire $78 million purchase price into its ratebase, rather than the approximately $75 million that should have

been used had it properly recorded the accumulated depreciation.

rectly, thereby avoiding any charge for transportation on a third company's system.

FERC does not now take issue with Northern Border's arguments. Rather, it maintains that Northern Border must demonstrate that it meets the *United* test in a rate proceeding under Section 4 of the Natural Gas Act, rather than in a Section 8 accounting proceeding. The Commission explains that accounting proceedings typically involve only FERC and the regulated utility because they normally concern compliance with the technical requirements of the Uniform System. (Natural was the only intervenor in the accounting proceeding, whereas many of Northern Border's customers who were interested in the rate issues associated with the line intervened in the Section 7 certificate proceeding. *See Northern Border* at ¶¶ 61,312–13.) Section 4 rate proceedings, by contrast, are specifically designed to receive customer views as to whether a pipeline's proposed rate change is just and reasonable. They provide for specific notice, hearing, and refund procedures so that the issues relating to the proposed rate change are properly addressed.

■ The application of the *United* test involves a fact-specific assessment of the benefits that Northern Border's customers received from the company's acquisition of the line. We believe it is entirely appropriate, therefore, for FERC to defer administration of the *United* test until the company's customers have an opportunity to offer their views. The question of "how best to handle related, yet discrete, issues in terms of procedures" is a matter committed to agency discretion. *See Mobil Oil Exploration & Producing Southeast v. United Distribution Cos.*, 498 U.S. 211, 230, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991). FERC has previously explained its policy of making *United* determinations in ratemaking, rather than accounting, proceedings. *See Minnesota Power & Light Co.*, 43 F.E.R.C. ¶ 61,104 (1988). It has not deviated from that policy.[2]

■ Third, Northern Border argues that FERC actually approved the company's accounting treatment in its Section 7 certificate proceeding. FERC's regulations require that applicants for certificate authorization file an Exhibit S, which includes, among other information, the "amount at which applicant proposes to record the facilities upon its books" as well as "the amount of the original cost to be recorded." 18 C.F.R. § 157.16(c)(5) (1997). Northern Border's Exhibit S stated that the "amount of accumulated provision for depreciation related to the original cost of the facilities to be acquired is *not applicable.*" (Emphasis added.) The Exhibit also said that "Northern Border will pay Natural the original cost ... of the facilities acquired." FERC did not object at that time to Northern Border's proposed accounting treatment so the company contends that the Commission was foreclosed from raising an objection during the subsequent accounting proceeding.

■ To be sure, a utility may seek a *United* determination from FERC during a Section 7 certificate proceeding. *See, e.g., Cities Service Gas Co.*, 4 F.E.R.C. ¶ 61,268 (1978), *amended on other grounds*, 23 F.E.R.C. ¶ 61,192 (1983). Like a Section 4 rate proceeding, a Section 7 certificate proceeding typically involves all interested parties and provides them with an opportunity to be heard. In this case, however, Northern Border never even reported in its application that the line's purchase price exceeded its depreciated original cost. Nor did the company specifically request FERC's permission to recover in rates the amounts by which the purchase price exceeded depreciated original cost or to account for the purchase in a manner inconsistent with the Uniform Sys-

---

**2.** Northern Border's related assertion that FERC acted unreasonably in adding a new requirement to the *United* test—that Northern Border prove Natural had never collected revenues from customers offsetting the approximately $3 million in accumulated depreciation—is similarly without merit. Contrary to petitioner, FERC never included a "depreciation offset requirement" in its formulation of the *United* test. In fact, Northern

Border raised the issue. The Commission merely observed in a footnote of its opinion that the company had yet to prove its contention. *Northern Border Pipeline Co.*, 73 F.E.R.C. ¶ 61,286, at 61,782 n. 20 (1995). In any event, FERC never purported to apply the *United* test in the accounting proceeding and therefore could not have added an additional element to the test.

tem. Although it is possible to read Exhibit S as indicating that Northern Border was not planning to record the accumulated depreciation in a manner consistent with the Uniform System, it certainly was not obvious and it is hardly unreasonable for the Commission to require an applicant to clearly signal its intention to put such an issue in play.

It is, of course, open to Northern Border to demonstrate in a Section 4 rate proceeding that it should be allowed to recover the full purchase price of the line. As FERC has made clear, its accounting decision was made without prejudice to such further action by Northern Border. *Northern Border Pipeline Co.*, 73 F.E.R.C. ¶ 61,286, at 61,782 (1995). But the Commission reasonably insists that Northern Border seek a *United* determination in a proceeding where all of its customers will be on notice and able to participate. Petitioner rather obviously seeks to circumvent that procedure; its petition is denied.