**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2535

CITY OF ROCKINGHAM, NORTH CAROLINA; AMERICAN RIVERS, INC.,

 Petitioners,

 v.

FEDERAL ENERGY REGULATORY COMMISSION; U.S. SECRETARY OF
COMMERCE,

 Respondents,

 and

DUKE ENERGY PROGRESS, LLC, f/k/a Duke Energy Progress, Inc.,

 Intervenor.

On Petition for Review of an Order of the Federal Energy Regulatory Commission.
(2206−030)

Argued: March 23, 2017                                      Decided: July 6, 2017

Before NIEMEYER, KING, and WYNN, Circuit Judges.

Petition for review denied by unpublished opinion. Judge Niemeyer wrote the opinion, in
which Judge King and Judge Wynn joined.

**ARGUED:** Robert Flynn Orr, Raleigh, North Carolina; Richard Roos-Collins, WATER AND POWER LAW GROUP PC, Berkeley, California, for Petitioners. Holly E. Cafer, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C.; Brian C. Toth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Julie Gantenbein, WATER AND POWER LAW GROUP PC, Berkeley, California; Nicholas T. Niiro, ROGERS JOSEPH O'DONNELL, San Francisco, California, for Petitioners. Max Minzner, General Counsel, Robert H. Solomon, Solicitor, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent Federal Energy Regulatory Commission. John C. Cruden, Assistant Attorney General, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent Secretary of Commerce. Garry S. Rice, Deputy General Counsel, DUKE ENERGY, Charlotte, North Carolina; John A. Whittaker, IV, Kimberly Ognisty, WINSTON & STRAWN LLP, Washington, D.C., for Intervenor Duke Energy Progress, LLC.

---

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

Duke Energy Progress, LLC, filed an application with the Federal Energy Regulatory Commission ("FERC") to renew its license for operation of two hydroelectric facilities on the Pee Dee River in North Carolina. After numerous proceedings over a period of nine years, consultations with other agencies, and consideration of all objections and suggestions — as well as a record consisting of thousands of pages — FERC entered an "Order Issuing New License" to Duke Energy on April 1, 2015. The conditions that FERC imposed in the Order reflected its consultation with other federal and state agencies and its consideration of comments and suggestions from numerous intervenors, public and private. All agencies and intervenors agreed to the terms of FERC's Order and the reasoning it gave, except two intervenors, who are the petitioners here.

The City of Rockingham, North Carolina, and American Rivers, Inc. filed this petition for review, essentially challenging the choices that FERC made with respect to the conditions it imposed for the license and FERC's presentation of its analysis of various disputed issues.

After consideration of the petitioners' numerous arguments, we find them all without merit and deny their petition for review.

I

Duke Energy operates a 108.6 megawatt facility consisting of two hydroelectric dams and related facilities on the Pee Dee River, denominated by FERC as the "Yadkin-

3

Pee Dee Hydroelectric Project No. 2206" (the "Project"). One dam, Tillery Dam, creates Lake Tillery and produces 84 megawatts of electricity, and the other, Blewett Falls Dam, creates Blewett Falls Lake and produces 24.6 megawatts of electricity. The Project also includes six recreational sites located below the Tillery Dam called "the Tillery Reach" and four recreational sites located below the Blewett Falls Dam. These sites provide boat ramps and docks, canoe portages, fishing piers, picnic tables, and parking. Duke Energy and its predecessor have operated and maintained the Project since 1958 under a 50-year license issued by FERC.

FERC is given the responsibility for issuing such licenses, as provided by Part 1 of the Federal Power Act, 16 U.S.C. § 808. That Act authorizes FERC to issue a license when a project is "such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses." *Id*. § 803(a)(1). In considering an application for a license, FERC must give equal consideration to "the power and development purposes for which licenses are issued" and "the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality." *Id.* § 797(e).

4

FERC's licensing authority is also subject to regulation by the National Environment Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, which requires the preparation of an environmental impact statement in circumstances such as these. *See id.* § 4332(C). FERC's licensing authority is also regulated by the Endangered Species Act, 16 U.S.C. § 1536(a), which requires that FERC's actions be "not likely to jeopardize the continued existence of any endangered species or threatened species," or result in the destruction or adverse modification of their designated critical habitat. In satisfying those requirements, FERC is required to consult with the National Marine Fisheries Service within the Department of Commerce ("NMFS") and obtain from it a biological opinion ("BiOp") and an incidental take statement that specifies the impact of the action to endangered species and the measures necessary to minimize that impact. *See id.* § 1536(b)(4).

In April 2006, in anticipation of the expiration of its license, Duke Energy filed an application with FERC for a renewal license for the Project. After receiving the application, FERC published a notice of it in the Federal Register and solicited motions to intervene and to protest. Seventeen entities responded and intervened, including public agencies such as the South Carolina Department of Natural Resources; the U.S. Department of the Interior; the North Carolina Wildlife Resources Commission; the North Carolina Department of Environment and Natural Resources; the South Carolina Department of Health and Environmental Control; and NMFS. Other entities also intervened, including Alcoa Power Generating, Inc.; American Rivers and the Coastal Conservation League, intervening collectively; The Nature Conservancy; Richmond

County; the Carolina Forest Association; Anson County; the City of Rockingham; and the Sandhill Rod and Gun Club.

After all intervenors were consulted, Duke Energy and all intervenors, except the two petitioners, reached a comprehensive settlement agreeing on all outstanding issues other than fish passage. The settlement agreement requested that FERC include the terms and conditions of the settlement with any order issued to renew Duke Energy's license. With respect to the issues relating to fish passage, both the NMFS and the Department of Interior's Fish and Wildlife Service made recommendations to FERC to increase minimum flows in order to enhance aquatic habitats for American shad in the Tillery Reach. Duke Energy agreed with the recommendation and, in February 2008, filed the agreement with the relevant agencies.

As required by NEPA, FERC issued an environmental impact statement that comprehensively addressed the Project, minimal water flows in the Tillery Reach, and recreational opportunities.

And as required, North Carolina issued its water-quality certification, approving Duke Energy's proposals as included in the settlement filed with FERC. The two petitioners appealed North Carolina's certification of water quality to the North Carolina Superior Court and the North Carolina Court of Appeals, both of which upheld the State's certification.

In 2013 and 2014, the petitioners filed three motions before FERC seeking to supplement the record to require a recreational flow study and to supplement the record to include a developmental analysis in the environmental impact statement with

6

additional information responding to their proposal to retrofit the Tillery Dam with new turbines so as to accommodate their preferred flows. FERC deferred its response to the petitioners' motions for inclusion to its Order on Duke Energy's application.

On April 1, 2015, FERC issued its Order granting Duke Energy a new 40-year license for the Project. In its 174-page licensing Order, it addressed the issues raised by the intervenors, including the three motions filed by the petitioners. FERC concluded that the Project, under the conditions proposed by the settlement along with some conditions added by FERC itself, was "best adapted to a comprehensive plan for improving or developing the Yadkin-Pee Dee River system." In particular, the licensing Order approved the settlement's increased minimum flows in the Tillery Reach, approved the settlement's recreation flows over in that same area, and rejected the petitioners' proposal that Duke Energy replace or modify its turbines to allow their requested higher flows.

The petitioners filed a petition for rehearing, arguing that FERC erred in not complying with the Federal Power Act, the NEPA, and the Endangered Species Act. FERC denied the petition for rehearing, and this petition for review followed.

II

The petitioners, in arguing that FERC violated the Federal Power Act, do not suggest that the conditions that FERC imposed in its licensing Order were not within the agency's discretion. Instead, they merely express disagreement with those conditions and

7

urge that they be replaced with their preferred conditions. They also criticize the format FERC used in expressing the reasons for the conditions it imposed.

First, the petitioners argue that FERC did not make explicit the goals for the river below Tillery Dam known as the Tillery Reach. They claim that FERC was required "to describe desired future conditions or goals for the beneficial uses of the Tillery Reach," giving as an example, that FERC could have stated, "[R]ecreation in the Tillery Reach, only 10 users per day under the original license, should increase to 100 users per day or more over the term of the new license." The Federal Power Act does not, however, require FERC to prepare or publish such an explicit list of goals. *See LaFlamme v. F.E.R.C.*, 945 F.2d 1124, 1128 (9th Cir. 1991). Rather, it requires that FERC ensure that all aspects of relicensing are "best adapted to a comprehensive plan for improving or developing a waterway or waterways" toward a variety of values like commerce, water-power, and wildlife preservation. 16 U.S.C. § 803(a)(1). In issuing its license to Duke Energy, FERC appropriately considered all these aspects as it discussed throughout its extensive 174-page licensing Order.

The petitioners also argue that FERC did not adequately describe its basis for finding that there was no conflict between the conditions of the new license and the plans created by other state and federal resource agencies, such as the NMFS. They state that FERC is required to consider the extent to which the project is consistent with plans prepared by those agencies. While they accept that FERC is not required to ensure that the project is *actually* consistent with these plans, they nonetheless argue that FERC failed to disclose adequately its consideration of and deliberations on the plans. In

8

making this argument, however, the petitioners fail to identify any specific resource agency plan that FERC failed to address. The environmental impact statement contains extensive discussion of natural resources, and the BiOp of the NMFS discusses extensively issues related to the Endangered Species Act. Both of these were fully considered by FERC's staff and extensively discussed by FERC in its Order. The petitioners' challenge essentially amounts to a formalistic argument, contending that FERC had a duty to list explicitly every plan by another agency and address it in turn. The text of the Federal Power Act, however, requires only that FERC consider these plans, and the petitioners have not demonstrated that FERC did not do so here.

Next, the petitioners claim that FERC erred in deferring consideration of their three motions calling for an expanded record, even though FERC did address their motions in the licensing Order. The petitioners fail to explain why this method for addressing their motions was an abuse of discretion. We conclude that it was not. *See, e.g.*, *Mobil Oil Exploration & Producing Se., Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) ("[A]n agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities" (internal citations omitted)).

Finally, the petitioners make a number of challenges alleging that FERC failed adequately to develop the record regarding a number of specific issues that FERC had before it. First, they argue that FERC failed to assess Duke Energy's use of power, although they concede that FERC addressed the use of power by Duke Energy's predecessor, Process Energy. A claim that FERC was required to reevaluate

9

that use of power when Duke Energy, through a merger with Process Energy, became the named licensee amounts to a challenge based simply on a name change. Because the name change was without practical effect, however, we fail to understand why the change would necessitate new findings. Indeed, FERC specifically found that "[t]he only effect of the merger [of Duke Energy and Process Energy] on the holder of the license . . . was a change in its name and a change in the licensee's holding company." The petitioners' vague statement that the Project is now operated in an "integrated manner" does not suggest that FERC erred in reaching this conclusion on the use of power.

The petitioners also argue that FERC should have conducted an independent study of petitioners' proposal to retrofit the turbines at the Tillery Dam, urging that the retrofit was necessary to balance power generation with higher minimum flows. FERC, however, did respond to the petitioners' argument and did so adequately. It found that the retrofit would be expensive and would "generate energy primarily during non-peak demand periods rather than peak-demand periods, which reduced the value of power." It also found that retrofitting the turbines would reduce water quality and would increase dangers to fish. The petitioners fail to explain why these findings were inadequate. Indeed, the findings appear to represent a reasoned application of the agency's expertise.

The petitioners next argue that FERC failed to complete the record with respect to the continuing impacts of Project operations on fish. This argument is based on a disagreement with the output FERC used in quantifying habitats over variable river flow. After considering three possible outputs — Weighted Usable Area, Index C, and Dual

Flow Analysis — FERC relied on the Weighted Usable Area output. It explained that it chose this method "because it enabled staff to study a whole suite of species across a range of sites." It explained further that it did not use the Dual Flow Analysis because that analysis is best used "to assess habitat availability where there is a potential trade off between the high- and low-flow limiting factors," and thus, was not well suited to this context, where high flow was not at issue. The petitioners' argument that FERC should have used the Dual Flow Analysis simply amounts to an expression of disagreement; they provide no basis for us to conclude that FERC's choice was not reasonable. This is exactly the sort of technical issue for which deference is designed. FERC reasonably explained its choice of technical methodology, and that decision warrants deference. As we have held, "agencies are entitled to select their own methodology as long as that methodology is reasonable." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999).

The petitioners argue that FERC did not complete the record with respect to recreation in the Tillery Reach, preferring that FERC conduct a field test of the computer model of navigability, make findings about other forms of recreation than boating, consider demand for recreation, and make findings regarding economic benefits of more recreation. Again, however, FERC thoroughly considered recreation in the Tillery Reach, concluding that the increased minimum flow it specified would improve boating conditions, tailoring increased flows during weekends and holidays during the recreation season. FERC rejected the petitioners' proposal for yet greater flows for recreation because such increased flows would cost nearly $200,000 and would provide limited

benefits." Again, the petitioners' argument reflects little more than their preference for a different outcome and their disagreement with the choice made by FERC. As with their other claims, the petitioners do not present any bases on which we might overturn FERC's well-explained decisions.

Finally, the petitioners argue that FERC failed to prioritize recreational use to the greatest extent possible, arguing that FERC's rules require that it seek "the ultimate development of [recreational] resources, consistent with the needs of the area to the extent that such development is not inconsistent with the primary purpose of the project." 18 C.F.R. § 2.7. They argue that, under this regulation, FERC was required to provide the "best or most extreme" recreation development. FERC, however, disagreed with the petitioners' interpretation of "ultimate development," concluding that it means the final development, not best development, of recreational resources that is "reasonable in light of the facts present in the case." We have little difficulty in concluding that FERC's interpretation is a reasonable, and probably the better, one. To read the regulation as the petitioners would have us read it would require FERC to pursue minimally valuable recreational advantages even if those additional advantages came at a disproportionate cost to the other statutory and regulatory objectives. It is eminently more reasonable to read "ultimate" as meaning "final," not as "the best at any cost." Moreover, were there any ambiguity as to the meaning of the regulation, we would defer to FERC's interpretation. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

12

## III

The petitioners next contend that FERC violated NEPA in failing to consider reasonable alternatives in assessing minimum instream flows, pointing in particular to its treatment of the proposed flow schedules as they proposed. While they acknowledge that FERC "considered and rejected" their proposal, they argue that it should have been considered as "a separate action alternative" in the environmental impact statement. Given their concession, however, that FERC did in fact consider their proposal, the petitioners have failed to explain why failure to consider their proposal as a so-called "separate action alternative" violates NEPA. The language of the statute simply requires FERC to "study, develop, and describe appropriate alternatives"; it does not require discussion of each possible alternative as a separate action alternative. *See* 42 U.S.C. § 4332(E). Indeed, the regulations explicitly permit FERC, in rejecting alternatives, merely to "briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). Absent any substantial flaw in FERC's consideration of the petitioners' proposal, we will not "flyspeck" the agency's decision based on the format in which it published its consideration. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186 (4th Cir. 2005) ("Courts may not 'flyspeck' an agency's environmental analysis, looking for any deficiency, no matter how minor").

## IV

Finally, the petitioners argue that FERC violated the Endangered Species Act because it did not ensure that the new license would not jeopardize the continued

existence of endangered species in area. Because FERC relied on the BiOp issued by NMFS in reaching its conclusion, the petitioners also argue that NMFS similarly violated the Endangered Species Act in its BiOp.

In making this argument, the petitioners return to FERC's decision to use for output the Weighted Usable Area and Index C, instead of a Dual Flow Analysis. But this argument is flawed for the same reasons that their similar argument was flawed under the Federal Power Act. NMFS explained its choice to use Index C and Weighted Usable Area outputs in considerable detail. The BiOp stated that NMFS chose to use Index C "because of the scale of the study and the number of simulations" as it "provides an estimate of habitat availability at the lower end of the habitat duration curve, which was judged by the stakeholder study team to be the more critical part of the curve." This choice by the agency represents a sort of "scientific determination" to which "a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

The petitioners also argue that FERC and NMFS behaved in an arbitrary and capricious manner by not considering alternative minimum flows in order to minimize incidental takings of sturgeon. They do not demonstrate, however, how the NMFS violated the Endangered Species Act. That Act provides specific procedures that apply for incidental takings. Specifically, if NMFS were to find that FERC's action would effect incidental takings of an endangered species but would not jeopardize its continued existence, it would have to prepare a statement which:

(i) specifies the impact of such incidental taking on the species,

14

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

* * *

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4). Here, NMFS did in fact prepare such a statement, and the petitioners nowhere explain why its statement does not satisfy the requirements of the Act.

*     *     *

For the reasons given, we deny the petition for review.

PETITION FOR REVIEW DENIED

15