972 F.2d 376
 297 U.S.App.D.C. 323
 TENNESSEE GAS PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Texas
Eastern Transmission Corporation, Pacific Interstate
Offshore Company, Pacific Offshore Pipeline Company,
Transcontinental Gas Pipe Line Company, Stingray Pipeline
Company, Enron Interstate Pipelines, ANR Pipeline Company,
Diamond Shamrock Offshore Partners Limited Partnership,
Amoco Production Company, High Island Offshore System,
Chemical Manufacturers Association, Process Gas Consumers
Group, et al., Pennzoil Exploration & Production Company, et
al., Tarpon Transmission Company, Union Pacific Resources
Company, Marathon Oil Company, Anadarko Petroleum
Corporation, Phillips Petroleum Company, Chevron U.S.A.,
Inc., Hunt Oil Company, Tennessee Small General Service
Customer Group, Public Service Electric and Gas Company,
Public Service Commission of the State of New York,
Nashville Gas Company, Central Hudson Gas & Electric
Corporation, Alabama-Tennessee Natural Gas Company, the
Berkshire Gas Company, et al., Union Carbide Corporation,
Long Island Lighting Company, Process Gas Consumers Group,
et al., and Chemical Manufacturers Association, Intervenors.
 Nos. 89-1094, 89-1257, 89-1455 and 89-1621.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 26, 1991.
Decided Aug. 14, 1992.
 
 [297 U.S.App.D.C. 324] On Petition for Review of Orders of the Federal Energy Regulatory Commission.
 Robert H. Benna, with whom Jeffrey G. DiSciullo and Jonathan L. Socolow, Washington, D.C., were on the brief for petitioner Tennessee Gas Pipeline Co. in Nos. 89-1094, 89-1257, 89-1455 and 89-1621. David D. Withnell, Washington, D.C., also entered an appearance for petitioner.
 R. Gordon Gooch, with whom Mark R. Haskell and Frederick W. Giroux, Washington, D.C., J. Stephen Martin, Houston, Tex., for Anadarko Petroleum Corp., and Brent Harshman, Dallas, Tex., for Diamond Shamrock Offshore were on the joint brief for producer-intervenors in Nos. 89-1094 and 89-1257. Dennis Moss and Jon L. Brunenkant, Washington, D.C., also entered appearances for producer-intervenors.
 Catherine C. Cook, Atty., F.E.R.C., with whom William S. Scherman, General Counsel, and Jerome Feit, Sol., Washington, D.C., were on the brief for respondent in all cases. Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent.
 
 
 1
 Terence J. Collins, Houston, Tex., entered an appearance for petitioner Tenneco Gas Pipeline Group in Nos. 89-1094, 89-1257, and 89-1455.
 
 
 2
 Sherrie N. Rutherford, Houston, Tex., David B. Ward, and Allan W. Anderson, Jr., Washington, D.C., were on the brief for intervenor Enron Interstate Pipelines in Nos. 89-1094 and 89-1257.
 
 
 3
 Judy M. Johnson and Kathleen T. Puckett, Houston, Tex., entered appearances for intervenor Texas Eastern Transmission Corp. in Nos. 89-1094, 89-1257, 89-1455, and 89-1621.
 
 
 4
 David L. Huard and E.R. Island, Los Angeles, Cal., entered appearances for intervenors Pacific Interstate Offshore Co. and Pacific Offshore Pipeline Co. in No. 89-1094.
 
 
 5
 Thomas F. Ryan, Jr., Robert G. Hardy, and Michael J. Fremuth, Washington, D.C., entered appearances for intervenor Transcontinental Gas Pipeline Corp. in No. 89-1094.
 
 
 6
 Brian D. O'Neill and Bruce W. Neely, Washington, D.C., entered appearances for intervenors Stingray Pipeline Co. in No. 89-1094.
 
 
 7
 Richard W. Miller, Jr. and Daniel F. Collins, Washington, D.C., entered appearances [297 U.S.App.D.C. 325] for intervenor ANR Pipeline Co. in Nos. 89-1094 and 89-1257.
 
 
 8
 Jack M. Wilhelm, Chicago, Ill., entered an appearance for intervenor Amoco Production Co. in Nos. 89-1094 and 89-1257.
 
 
 9
 Christopher T. Boland and Peter C. Lesch, Washington, D.C., entered appearances for intervenor High Island Offshore System in No. 89-1094.
 
 
 10
 Edward J. Grenier, Jr. and Gail S. Gilman, Washington, D.C., entered appearances for intervenors Chemical Manufacturers Ass'n and Process Gas Consumers Group, et al. in Nos. 89-1094, 89-1257, and 89-1455.
 
 
 11
 Phillip D. Endom, Martin J. Marz, and Charles A. Moore, Houston, Tex., entered appearances for intervenor Sea Robin Pipeline Co. in Nos. 89-1094 and 89-1257.
 
 
 12
 Eugene R. Elrod, Nancy Y. Gorman, Washington, D.C., and Phillip D. Endom, Houston, Tex., entered appearances for intervenor Tarpon Transmission Co. in Nos. 89-1094 and 89-1257.
 
 
 13
 Alan W. Tomme, Fort Worth, Tex., entered an appearance for intervenor Union Pacific Resources Company in Nos. 89-1094 and 89-1257.
 
 
 14
 Jennifer A. Cates, Houston, Tex., entered an appearance for intervenor BP Exploration, Inc. in No. 89-1094.
 
 
 15
 Jon L. Brunenkant, Washington, D.C., and Robert C. Murray, Houston, Tex., entered appearances for intervenor Marathon Oil Co. in Nos. 89-1094 and 89-1257.
 
 
 16
 John K. McDonald, Washington, D.C., entered an appearance for intervenor Pennzoil Exploration and Production Co., et al. in No. 89-1257.
 
 
 17
 Larry Pain and Luke A. Mickum, Bartlesville, Okl., entered appearances for intervenor Phillips Petroleum Co. in No. 89-1257.
 
 
 18
 David R. Stevenson, Houston, Tex., entered an appearance for intervenor Chevron, U.S.A. in No. 89-1257.
 
 
 19
 Kevin M. Sweeney, Washington, D.C., entered an appearance for intervenor Hunt Oil Co. in No. 89-1257.
 
 
 20
 Robert R. Nordhaus and Howard Eliot Shapiro, Washington, D.C., entered appearances for intervenor Union Carbide Corp. in Nos. 89-1257 and 89-1455.
 
 
 21
 Priscilla A. Mims, Lombard, Ill., entered an appearance for intervenor Natural Gas Pipeline Co. in No. 89-1257.
 
 
 22
 Michael J. Manning and James F. Moriarty, Washington, D.C., entered appearances for intervenor Tennessee Small General Service Customer Group in Nos. 89-1455 and 89-1621.
 
 
 23
 Kenneth D. Brown and James R. Lacey, Newark, N.J., entered appearances for intervenor Public Service Elec. and Gas Co. in Nos. 89-1455 and 89-1621.
 
 
 24
 Richard A. Solomon and David D'Alessandro, Washington, D.C., entered appearances for intervenor Public Service Com'n of the State of N.Y. in No. 89-1455.
 
 
 25
 Jerry W. Amos, Greensboro, N.C., entered an appearance for intervenor Nashville Gas Co. in Nos. 89-1455 and 89-1621.
 
 
 26
 Donald K. Dankner and Frederick J. Killion, Washington, D.C., entered appearances for intervenor Central Hudson Gas & Elec. Corp. in Nos. 89-1455 and 89-1621.
 
 
 27
 Paul W. Diehl, Washington, D.C., entered an appearance for intervenor Alabama-Tennessee Natural Gas Co. in Nos. 89-1455 and 89-1621.
 
 
 28
 John W. Glendening, Jr., Barbara K. Heffernan, and Bruce B. Glendening, Washington, D.C., entered appearances for intervenors Berkshire Gas Co., et al. in Nos. 89-1455 and 89-1621.
 
 
 29
 O. Julia Weller and James F. Bowe, Jr., Washington, D.C., entered appearances for intervenor Long Island Lighting Co. in Nos. 89-1455 and 89-1621.
 
 
 30
 William I. Harkaway, Harvey L. Reiter, Washington, D.C., and Barbara M. Gunther, New York City, entered appearances for intervenor Consolidated Edison Co. of New York, Inc. in No. 89-1621.
 
 
 31
 Before WALD, D.H. GINSBURG, and RANDOLPH, Circuit Judges.
 
 
 32
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 
 
 33
 [297 U.S.App.D.C. 326] D.H. GINSBURG, Circuit Judge:
 
 
 34
 The petitioner (Tennessee), a purchaser, transporter, and seller of natural gas, and a purchaser of transportation services, seeks review of six orders of the Federal Energy Regulatory Commission, three of which promulgate rules and regulations under the Natural Gas Act (NGA) and section 5 of the Outer Continental Shelf Lands Act (OCSLA), and three of which apply those rules to the petitioner. We deny all of the petitions except insofar as the orders they challenge regulate onshore activities, in which regard we remand this matter to the agency.
 
 I. THE ORDERS
 
 35
 Section 5 of the OCSLA provides that every "pipeline on or across the outer Continental Shelf of oil or gas ... must provide open and nondiscriminatory access to both owner and nonowner shippers." 43 U.S.C. § 1334(f)(1) & (1)(A). In Order No. 491 the FERC promulgated an interpretive rule in which it spelled out the meaning of § 5 as follows:
 
 
 36
 [I]f all of an OCS pipeline's capacity is under firm transportation contracts and if the pipeline received another request for firm transportation service, the pipeline would be required to allocate capacity on a pro rata basis in order to provide the requested service. Similarly, if a pipeline receives a request for interruptible transportation service, the pipeline would be required to reallocate its interruptible capacity on a pro rata basis in order to provide the requested service. Of course, an interruptible shipper cannot receive priority over a firm shipper.
 
 
 37
 43 FERC p 61,006, at 61,032 (1988).
 
 
 38
 The Commission promulgated this interpretation in response to complaints it had received from shippers "stating that they have been unable to secure the transportation of gas from the OCS to onshore destinations." Id. at 61,031. Because the complaints all concerned interstate natural gas pipelines subject to the NGA, the Commission concluded that "although the OCSLA may cover facilities outside the scope of the NGA ... at this time, it is unnecessary to extend its interpretation of section 5 of the OCSLA to govern those facilities." Id.
 
 
 39
 In Order No. 509 the Commission reversed itself to the extent of making the proration scheme of Order No. 491 optional with each individual OCS pipeline. 53 Fed.Reg. 50,925, 50,929-30 (1988). The Commission newly required, however, that every OCS pipeline accept a blanket transportation certificate. This had the effect of (1) enabling an incumbent shipper voluntarily to relinquish its right to firm transportation capacity if another shipper requests capacity and agrees to assume all of the obligations of the incumbent shipper's firm service agreement, and (2) subjecting OCS pipelines to the requirement of filing a transportation rate schedule pursuant to Subpart A of Part 284 of the Commission's regulations. Further, because new shippers would then be subject to Part 284 rates while existing shippers on the same pipeline would be subject to Part 154 (individually certificated) rates, which the Commission viewed as an unjust discrimination in the prices paid by similarly situated customers, it also provided "under section 5 of the NGA" that the Part 284 rates would be applicable, once approved, "to all transportation service performed by the OCS pipeline." Id. at 50,930 (emphasis in original). For these purposes, Order No. 509 defined an OCS pipeline so as to include all "facilities that fall within the scope of the Commission's jurisdiction under section 7 of the NGA, and that are used or necessary to transport OCS gas off of the OCS to the first point of interconnection with some other entity" on the shoreward side of the OCS. Id. at 50,932. This definition made the regime of Order No. 509 applicable to some onshore pipeline facilities but inapplicable to all offshore gathering facilities, which link producing fields to interstate pipelines on the OCS.
 
 
 40
 On rehearing, the Commission issued a third Order, No. 509-A, which seemed further to relax the regime applicable to the OCS, this time by providing that an OCS pipeline might be able to go on charging individually certificated Part 154 rates instead of the regulated Part 284 rates that [297 U.S.App.D.C. 327] are normally required under a blanket certificate. Although the FERC "continue[d] to believe that the existing rates are unjust, unreasonable, and unduly discriminatory, because they can result in situations wherein two shippers would be paying different rates for the same service," it decided to proceed "on a case specific basis." 54 Fed.Reg. 8301, 8305 (1989). Each OCS pipeline was invited to file a statement "which explains why [it] believes that continued use of [Part 154 rates] would not be unjust, unreasonable or discriminatory." Id. The Commission also refused to extend the application of the OCS rules beyond the first point of receipt located off the OCS (i.e., onshore), stating that "any such extension ... would significantly exceed [its] underlying statutory authority under the OCSLA." Id. at 8307.
 
 
 41
 Against this backdrop of general rulemaking, the petitioner sought clarification and relief specific to its situation. As a result, the FERC issued three further orders addressing the petitioner's requests, more often than not to deny them. The March 1989 Order rejected the petitioner's request to limit the scope of Orders 509 and 509-A to facilities that neither receive nor deliver gas onshore. The Commission held that those Orders apply from the OCS to "the first point of interconnection with another entity that might receive gas from the OCS pipeline, regardless of whether the actual delivery point is beyond this first point of interconnection." 46 FERC p 61,413, at 62,306 (1989).
 
 
 42
 The May 1989 Order responded to the petitioner's claim that an unworkable situation would arise
 
 
 43
 where an existing shipper voluntarily relinquishes capacity, [because] the replacement shipper would acquire service only from the receipt point on the OCS to the first point of interconnection off the OCS to the delivery point specified in its transportation agreement with Tennessee.
 
 Tennessee contended that
 
 44
 the replacement shipper would have no delivery point and the existing shipper would have no receipt point, and thus that the relinquishment of capacity would result in both the existing and the replacement shippers having capacity that they could not use.
 
 
 45
 47 FERC p 61,299, at 62,075 (1989).
 
 
 46
 The Commission clarified that it was requiring the replacement shipper to assume all of the incumbent shipper's obligations, including those onshore, and reiterated its pledge (first made in Order No. 509-A) that it would "endeavor to process any necessary abandonment applications expeditiously." Id. at 62,076. This Order also declared that the petitioner's generally applicable (i.e., open access) transportation rates "would apply to new and replacement shippers on the OCS ... [and] to transportation onshore--after the first point of interconnection." Id.
 
 
 47
 Finally, the July 1989 Order responded to Tennessee's request for clarification. First, the Commission made it clear that although a new or replacement shipper is to be "charged rates that conform to Part 284 for OCS transportation and open-access rates for onshore transportation," an existing shipper will continue to pay existing individually certificated rates. 48 FERC p 61,080, at 61,365 (1989) (footnotes omitted). Second, in the course of reasoning to that conclusion, the Commission stated that upon a shipper's voluntary release of capacity, the pipeline must file an abandonment application "for any portion of the transportation service that is beyond the first shoreward point of interconnection, that is, for onshore transportation," and must supply to the replacement shipper "onshore transportation under the pipeline's open-access blanket certificate." Id.
 
 II. ANALYSIS
 
 48
 The petitioner maintains that there are three defects in this series of Orders. First, it argues that the Commission's failure to subject gathering facilities on the OCS to these regulations is discriminatory and arbitrary; the concern here is that given the opportunity, a pipeline owner that also produces gas will give preference to the transportation of its own gas over that of other producers. Second, the petitioner [297 U.S.App.D.C. 328] lambasts the optional version of the pro rata allocation scheme because it denies to shippers the procedural protections afforded them under § 7(b) of the NGA. Third, the petitioner argues that the Commission has exceeded its authority by regulating onshore transportation pursuant to the OCSLA, in derogation of the regulatory regime established by the NGA.
 
 A. The Exemption of Gathering Facilities
 
 49
 The petitioner details as follows the economic discrimination that may result from the Commission's decision not to subject gathering facilities to its open-access Orders: "At times when demand for gas is high, a producer/gatherer could give transportation preference to its own volumes over those of other shippers. Also, gatherers can charge rates to shippers on their systems which overrecover the costs of providing the service, thereby subsidizing the gatherers' own transportation."
 
 
 50
 The Commission replies simply that it was reasonable to deal with access problems on the OCS by building upon its NGA regulations, which cover interstate pipelines but not gathering facilities, because as it said in Order No. 509-A, "interstate pipelines ... are clearly within the Commission's jurisdiction under the NGA. Moreover, the Commission already has an established open-access program that can, with few modifications, be applied to such pipelines." 54 Fed.Reg. at 8303. Finally, the Commission acknowledged "that the open access mandate of the OCSLA applies to all pipeline operations on the OCS, and [stated that it] will consider appropriate measures for remedying discriminatory access to other OCS facilities on a case by case basis." Id.
 
 
 51
 We agree with the FERC to the extent of saying that the distinction it has drawn is not facially unreasonable. We express no view today upon the merits of the petitioner's argument that the distinction unreasonably creates an incentive to discriminate because we do not think that question is now ripe for judicial resolution. When the present record was closed no such discrimination had as yet been documented. Whether producer/gatherers have the ability as well as the incentive to discriminate, and whether that incentive is strong enough to induce them actually to discriminate (which may not be without its costs) remain to be seen.
 
 
 52
 Perhaps most important, the Commission promised to address case-by-case such complaints of discrimination as shippers might later raise. The agency is entitled to make reasonable decisions about when and in what type of proceeding it will deal with an actual problem. See Mobil Oil Exploration v. United Distrib. Companies, 498 U.S. 211, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991) ("An agency enjoys broad discretion in determining how best to handle related yet discrete issues in terms of procedures, and priorities, ... [as is the case] where a different proceeding would generate more appropriate information and where the agency was addressing the question") (citing Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), and Heckler v. Chaney, 470 U.S. 821, 831-32, 105 S.Ct. 1649, 1655-56, 84 L.Ed.2d 714 (1985)). Surely it has as much or more discretion to decide whether to take up a merely potential problem, one that may or may not materialize soon enough. The Commission's wait-and-see approach may be particularly appropriate in this situation, where there is a real question whether it has jurisdiction over gathering facilities under § 7(b) of the NGA, 15 U.S.C. § 717f(b). See 54 Fed.Reg. at 8303 ("The most rational starting point for promulgating regulations to implement section 5 of the OCSLA is with interstate pipelines that are clearly within the Commission's jurisdiction under the NGA"); Brief of Intervenors at 5 (challenging FERC jurisdiction over rates charged by gathering facilities on the OCS).
 
 
 53
 In a similar vein, the petitioner complains that the FERC has created an incentive for pipeline companies to get the agency to reclassify their transmission facilities as exempt gathering facilities; indeed the petitioner [297 U.S.App.D.C. 329] represents that such shenanigans are already afoot. For most of the reasons stated in connection with the petitioner's incentive-to-discriminate argument, its incentive-to-finagle argument is also unripe. Insofar as the petitioner claims that the potential problem has become an actual problem, it relies upon anecdotal and extra-record reports, which we must disregard. Thus, we have no basis in the present record for overturning the FERC's decision not to apply its open access regulations to gathering facilities.
 
 B. The Voluntary Pro Rata Scheme
 
 54
 Under the voluntary pro rata scheme that the Commission endorsed in principle in Order No. 509, an OCS pipeline could file a tariff enabling it to curtail its service to an existing firm transportation customer in order to serve a new customer. The petitioner argues that such a tariff would unlawfully deprive the existing customer of the protection afforded by § 7(b) of the NGA. That provision protects a shipper from a pipeline's unilateral "abandonment" of service by requiring the prior approval of the Commission, which must be based upon a finding "that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 15 U.S.C. § 717f(b).
 
 
 55
 The petitioner complains that the Commission did not address "any of [its] arguments against 'permissible' pro rata transportation. Instead the Commission has stated that these issues belong in any future proceeding when the Commission seeks to require or allow pro rata transportation." Urging immediate judicial redress, the petitioner claims that "existing shippers were immediately aggrieved by Order No. 509 because they instantly lost their ability to rely upon the firm transportation entitlement for which they have paid reservation charges as well as their right to a hearing before their service is cut off." Absent a more particularized claim of harm, the shippers' lost "ability to rely" is at best an uncertain basis upon which to predicate the jurisdiction of a federal court, which is limited to the resolution of an actual case or controversy.
 
 
 56
 The petitioner also instances a host of problems that "could" or "would" arise if service to an existing customer were to be diverted to a new customer. It would be premature, however, in reviewing the FERC's mere announcement of the voluntary pro rata scheme, to consider all the potential adverse and irrational effects that the petitioner can conjure up, unrestrained by any reality check. Whether any OCS pipeline serving the petitioner will actually file the tariffs necessary to participate in this program or, assuming one does, the nature of any injury that the petitioner may in fact suffer, remains to be seen. As a result, "both the fitness of the [further] issues for judicial decision and the hardship to the parties of withholding court consideration" is at this point only speculative. Abbott Lab. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Consequently, the petitioner's challenge to this scheme is not ripe at this point, on this record.
 
 
 57
 Even if the petitioner's claim were ripe, we would be hard pressed to hold that the Commission abused its discretion in deferring resolution of the petitioner's objection until such time as a pipeline avails itself of the Commission's invitation to propose a prorating tariff. See, e.g., American Gas Ass'n v. FERC, 888 F.2d 136, 151-52 (D.C.Cir.1989); see also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 545, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978) (agency has discretion in establishing the "time dimensions of the needed inquiry") (citation omitted). The Commission expressly declared that the question of its statutory authority to approve such a tariff provision was "beyond the scope of this proceeding," 54 Fed.Reg. at 8303; as a result, neither the petitioner nor any other protestant opposing such a tariff, should one be filed, will be in any way disadvantaged by Order No. 509. It would be particularly imprudent for us to resolve now an issue that the agency itself has reasonably deferred until such time as a concrete case may arise.[297 U.S.App.D.C. 330] C. Onshore Regulation
 
 
 58
 Because the Commission's Orders apply to the transportation of gas from the OCS pipeline to the ultimate delivery point onshore, the petitioner challenges the agency's authority, by regulation under the OCSLA, to displace the regime established by the NGA. In its March 1989 Order, the Commission required that when a shipper relinquishes transportation service through an onshore segment of an OCS pipeline, the petitioner must file an abandonment application and then apply for a new § 7(c) certificate to serve a new shipper. The Commission later provided that the petitioner is not to charge the new shipper at the old shipper's rate, but is to charge only the generally applicable rate. See July 1989 Order, 48 FERC p 61,080, at 61,365, quoted above. The petitioner objects both to the abandonment-and-certification requirement and to the change in its rates without the formality of finding the old rate unreasonable and the new rate reasonable pursuant to NGA § 5.
 
 
 59
 We first consider the FERC's claim that the petitioner is not entitled to present these issues to the court because it did not seek rehearing of Order No. 509-A. See NGA § 19(a), 15 U.S.C. § 717r(a). The petitioner, which did seek rehearing of the March and July 1989 Orders, emphasizes that its "objections arise from the application of the rule to Tennessee and not from the rule itself." We agree. A different party, an OCS pipeline company that wanted the FERC to apply the abandonment procedure to onshore segments of OCS pipelines, petitioned the Commission to clarify Order No. 509 to that effect. Instead, the Commission, noting that "not all OCS pipelines are in [the same] position," declared itself "reluctant to have any part of Order No. 509 or the OCSLA govern the transportation of natural gas in interstate commerce onshore." Order No. 509-A, 54 Fed.Reg. at 8310. Thus, as of Order No. 509-A, it appeared that the FERC would not apply abandonment procedures to the onshore segment of an OCS pipeline.
 
 
 60
 Tennessee had no reason to seek rehearing on this point; its interest was served by the agency's position. It was only in a later Order applying the rule to the petitioner that the Commission announced that "[a] separate abandonment application must be made, and approved by the Commission, for any portion of the transportation service that is beyond the first shoreward point of interconnection, that is, for onshore transportation." July 1989 Order, 48 FERC p 61,080, at 61,364-65. We therefore reject the agency's argument that the petitioner was required to complain earlier about its application of the abandonment procedure to onshore segments of OCS pipelines in order to preserve its right to judicial review.
 
 
 61
 We return to the March and July 1989 Orders, in which the FERC respectively required that a pipeline apply under § 7 to abandon an onshore transportation segment before reallocating service to a new shipper, and that it charge the new shipper the generally applicable rate. The petitioner argues that the Commission lacks the authority to regulate onshore transportation in this manner under either the NGA or the OCSLA, and that the Commission's scheme for forcing a change of rates solely by the operation of regulation is in derogation of § 5 of the NGA. That section requires that the Commission find an existing rate unreasonable, and a new rate reasonable, before it may effect such a change, and that it follow certain procedures to that end.
 
 
 62
 As the petitioner observes in support of the former point, "the Commission did not cite any authority or provide any basis for ordering Tennessee to abandon existing service prior to expiration of the underlying contract." Nor does the Commission respond in its brief to the petitioner's argument that it lacks statutory authority for its order. Our own review of the NGA turns up no provision expressly giving the Commission authority to order an unwilling pipeline to "abandon" a certificated service. And no prior judicial decision of which we are aware countenances the Commission's ordering a pipeline to abandon a service or to file an application therefor. In these circumstances, we are constrained to remand [297 U.S.App.D.C. 331] this matter to the agency so that it may either identify the authority for or alter its rule. We do not now consider the petitioner's § 5 argument, therefore.
 
 
 63
 We note, however, the existence of a real question whether the mere reallocation of service from one customer to another, without a change in the quantum of service provided to the market, constitutes an abandonment within the meaning of § 7(b). A § 7(b) abandonment clearly occurs when there is a reduction or alteration in overall service to the interstate market, but the rationale of the cases closest in point might imply that such abandonment does not occur when there is no such loss of service to the market. See United Gas Pipe Line v. FPC, 385 U.S. 83, 88, 87 S.Ct. 265, 268, 17 L.Ed.2d 181 (1966) (upholding application of the "abandonment" procedure to a company that indefinitely terminated the operation of a facility because the Commission "ha[s] a regulatory responsibility to assure that gas once dedicated to the interstate market will continue to be available to that market so long as the public interest demands") (quoting 31 F.P.C. 1079, 1082); Kansas Power & Light Co. v. FERC, 851 F.2d 1479, 1485 (D.C.Cir.1988) (approving FERC's authorization of limited term abandonments of gas sales in order to enable producers to sell gas that would otherwise be shut in, and noting that FERC had "explicitly shifted the identification of the public interest away from the interest of only specific customers to the interest of the market as a whole") (quotation marks and emphasis omitted); Reynolds Metals Co. v. F.P.C., 534 F.2d 379, 384 (D.C.Cir.1976) ("An 'abandonment' within the meaning of section 7(b) occurs whenever a natural gas company permanently reduces a significant portion of a particular service"). But cf. Panhandle Eastern Pipe Line Co. v. FERC, 803 F.2d 726, 727 (D.C.Cir.1986) (§ 7(b) applicable to proposed termination of gas purchases where pipeline "did not seek to abandon any of its certificated facilities but ... the character of the use of the facilities ... will change"). We leave this matter to the Commission to consider in the first instance, bearing in mind that if there is no abandonment entailed in a pro rata reallocation, then it follows that the Commission cannot order the pipeline to file an application for abandonment in that circumstance.
 
 III. CONCLUSION
 
 64
 For the reasons set out in Part II.C above, we remand this matter to the Commission for further consideration of the Orders under review insofar as they purport to require a pipeline to seek abandonment of a certificated onshore transportation service, and to charge a replacement shipper pursuant to the pipeline's onshore blanket certificate. In all other respects we deny the petition.
 
 
 65
 So Ordered.