Ciparick, J.
(dissenting). We are all in agreement that the Commissioner may restrict the use of DEBT in high concentrations. We also agree that registrations for pesticide products not in compliance with the proposed DEBT concentration rule must be cancelled pursuant to title 7. We differ with the majority concerning the nature and content of the title 7 cancellation proceedings. Specifically, the majority holds that the scientific issues underlying the DEBT rule may not be "relitigated” during title 7 proceedings once they have been aired at an informal public rule-making hearing. Our analysis *399 of article 33 as a whole leads us to conclude that permitting the Commissioner to resolve complex scientific policy questions on the basis of the data developed at only a rule-making hearing would be inimical to the Legislature’s considered approach to pesticide regulation. Accordingly, we respectfully dissent.
By letter dated May 22, 1991, the Department of Environmental Conservation’s Bureau of Pesticide Management (DEC) informed DEBT product registrants of its intention to amend 6 NYCRR part 326 to limit the registration of personal use insect repellant products containing DEBT to those containing 30% or less of the pesticide. On July 23, 1991, DEC held a public hearing on the proposed DEBT rule, at which time eight persons spoke in favor of the continued availability of high concentration DEBT products. Only DEC’s representative spoke in favor of the proposed rule. Written comments were subsequently submitted to DEC.
On April 3, 1992, DEC issued its Notice of Adoption of the proposed rule, modified only to the extent of raising the permissible DEBT concentration level from 30% to 33.33% for controlled-release formulations.[1] Shortly thereafter, affected DEBT registrants were advised that their product registrations would be cancelled for noncompliance effective May 11, 1992.
Pursuant to title 7 of ECL article 33, the affected registrants requested that DEC refer the cancellation decision to an independent expert advisory committee for their review and commentary on the underlying scientific issues. DEC denied the request, stating that title 7 does not provide for advisory committee review when the Commissioner acts pursuant to its title 3 rule-making authority.
Petitioners commenced this proceeding seeking declaratory and injunctive relief. Supreme Court concluded that DEC was *400 not authorized to cancel products by rule making and declared the DEBT rule invalid. The Appellate Division modified, declaring that 6 NYCRR 326.2 (b) (10), the DEBT rule, "has not been shown to be invalid.” Although the Court concluded that DEC must comply with title 7 when cancelling registrations of noncomplying products, it held that registrants "cannot challenge the validity of the DEBT regulation” in the title 7 proceedings (197 AD2d 314, 320).
Petitioners appealed to this Court on constitutional grounds. Implementation and enforcement of the DEBT rule has been stayed pending a final determination of this appeal.
Statutory Scheme
The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) (7 USC §§ 136-136y), as administered by the Environmental Protection Agency (EPA), comprehensively regulates pesticides at the Federal level. The EPA is authorized to give notice of its intent to cancel a pesticide registration, "If it appears * * * that a pesticide * * * does not comply with * * * [FIFRA] or * * * generally causes unreasonable adverse effects on the environment” (7 USC § 136d [b]). "Noncompliance” determinations involve a risk/benefit analysis which balances the environmental, economic, and social costs and benefits associated with continued use of a pesticide (see, Environmental Defense Fund v Environmental Protection Agency, 489 F2d 1247, 1250-1252).
ECL article 33, which is expressly modeled after FIFRA, regulates pesticides at the State level. Like FIFRA, ECL article 33 embodies a balanced risk/benefit approach to pesticide regulation (see, ECL 33-0301).[2] The ECL expressly provides that "it is desirable that there should be uniformity between the requirements of the several states and the federal *401 government relating to pesticides” (ECL 33-0303 [4]; Weinberg, Practice Commentary, McKinney’s Cons Laws of NY, Book 17 Vi, ECL art 33, at 656 [art 33 and FIERA should be read in conjunction]). Accordingly, DEC’S regulations provide that, except in the case of a conflict, "the rules and regulations applicable to and in conformity with the primary standards established by article 33 of the Environmental Conservation Law shall be those promulgated pursuant to ¡FIERA]” (6 NYCRR 320.1).
Title 3
Title 3 of ECL article 33 vests the Commissioner with exclusive jurisdiction over "all matters pertaining to the distribution, sale, use and transportation of pesticides” (ECL 33-0303 [1]). This delegation of power includes authorization to "promulgate a list of restricted use pesticides and the usages of such pesticides that may be permitted subject to whatever conditions or limitations which the commissioner deems appropriate to fully protect the public interest” (ECL 33-0303 [3] [d]).[3] The Commissioner is authorized to "adopt, promulgate and issue such rules and regulations as he may deem necessary to carry out and give full force and effect to the provisions of this article” (ECL 33-0303 [3] [e]).
The declared purpose of title 3 was "[t]o make it unlawful for any person to distribute, sell, offer to sell, purchase, possess or use without a permit a 'restricted use pesticide’ ” (Mem of State Executive Dept, 1970 McKinney’s Session Laws of NY, at 2986). Title 3 augmented the Commissioner’s powers as they related to registered pesticides classified as "restricted use”, requiring sellers and distributors of such pesticides to obtain "commercial permits”, and persons purchasing them for actual use to obtain "purchase permits” (id.; Letter from Member of Assembly Hardt, Bill Jacket, L 1970, ch 732, at 1). The Commissioner was authorized to revoke and to refuse to issue commercial and purchase use permits. Enforcement was "strengthened generally” by permitting the Commissioner to seize a restricted use pesticide for which a permit had not been issued as well as by permitting the suspension of a *402 pesticide registration presenting an imminent hazard to the public (Executive Mem, op. cit., at 2987). Thus, title 3 was enacted to improve the Commissioner’s ability to control misuse of registered pesticides by sellers, distributors, farmers, and other applicators. It does not address the cancellation of pesticide registrations.
Title 7
From 1947 through 1963, the United States Department of Agriculture (USDA), the former administering agency of FIFRA, lacked the authority to refuse to register or cancel a pesticide (see, Pub L 80-104, 61 US Stat 163, 168). In 1964, Congress amended FIFRA to authorize USDA to deny or cancel Federal pesticide registrations, subject to advisory committee review and an adjudicatory hearing. In 1965, to ensure uniformity with FIFRA, the New York Legislature similarly amended the predecessor version of ECL article 33 (Agriculture and Markets Law former art 11). The 1965 amendments (L 1965, ch 228) authorized the Commissioner to deny or cancel a pesticide registration whenever the product or its labeling did not comply with the provisions of article 11 (now ECL art 33) (see, Mem of Joint Legis Comm on Natural Resources, 1965 NY Legis Ann, at 84-85).
As with the virtually identical Federal amendments, a registrant affected by the Commissioner’s noncompliance decision was afforded certain procedural rights. Under title 7 of ECL article 33, whenever the Commissioner determines that a pesticide registration should be cancelled, the registrant, within the prescribed 30-day time period, may (1) make necessary corrections (ECL 33-0713 [3]); (2) file a petition requesting that the matter be referred to an advisory committee comprised of qualified experts who will review the relevant data and submit to the Commissioner a report and recommendation regarding the proposed cancellation (ECL 33-0715); or (3) the registrant may file objections and request an adjudicatory public hearing before an Administrative Law Judge (ECL 33-0717). The Commissioner may accept, reject, or modify the recommendations of the advisory committee or Administrative Law Judge (id.). The Commissioner’s final determination may be challenged pursuant to CPLR article 78 (ECL 33-0721).
The scientific advisory mechanism created by the 1965 amendments manifests the Legislature’s intention of striking a proper balance between preservation of the public safety and assurance of due process to registrants in situations *403 involving cancellation for noncompliance: "The authorization for an advisory committee is in furtherance of fair and equitable treatment of applicants, and the people of the state, represented by the Commissioner” (Mem of Joint Legis Comm on Natural Resources, 1965 NY Legis Ann, at 85). Title 7 fulfills another, more critical function in the over-all scheme of article 33 — it provides DEC with objective technical data to assist it in weighing the risks and benefits associated with continued use of a particular pesticide, thus insuring that DEC acts on a sound, scientifically informed basis. Clearly, title 7’s purpose was the promotion of informed administrative decision-making and judicial review:
"The scientific knowledge and impartial evaluation of a pesticide by such a[n advisory] committee can only be for the best interests of all.
"The administrative procedural steps provided and required by the bill insure an applicant or registrant a full hearing and consideration, and will protect and safeguard the health, welfare and safety of the public” (Letter from Commissioner Wickham to Honorable Sol Corbin, petitioner’s Appendix, at A-26 [emphasis added]; see, Mem of Joint Legis Comm on Natural Resources, 1965 NY Legis Ann, at 85; 3 Rodgers, Environmental Law, Pesticides and Toxic Substances § 5.2 [B] [2] [purpose of science advisory apparatus was to strengthen technical input to agency and bring a fresh, credible perspective to disputed scientific issues, which would aid judicial review]).
Thus, in plain, compulsory language, title 7 clearly gives any person adversely affected by a notice of cancellation the right to request a hearing on the matter. Title 7 constitutes the only legislative statement directly addressing the precise issue we confront today — cancellation of existing pesticide registrations.
Title 3/Title 7 Interplay
As the majority correctly observes, generally an agency can promulgate a legislative rule which eliminates the justification for a statutorily prescribed adjudicatory hearing on factual issues (see, Mobil Oil Exploration v United Distrib., 498 US 211, 228). However, the majority interprets and applies this principle as if no exceptions are possible. To begin with, it is fundamental that an agency has the power to issue binding *404 legislative rules only if and to the extent Congress has authorized it to do so (see, Mobil Oil, supra, at 223; United States v Storer Broadcasting Co., 351 US 192, 202-203; 1 Davis and Pierce, Administrative Law § 6.3, at 234 [3d ed]).
In this case, it is undisputed that title 3’s general rule-making authority does not expressly empower the Commissioner to bypass title 7 and cancel pesticide registrations based only on an informal public rule-making hearing. The majority, in imputing this power to the Commissioner, has accorded the agency unprecedented deference. That an agency possesses rule-making authority does not end all inquiry; it is still appropriate to examine whether an agency may lawfully override legislative mandates contained in complementary portions of the enabling statute (see, 1 Davis and Pierce, Administrative Law § 6.3, at 235 [3d ed]; see also, Matter of Campagna v Shaffer, 73 NY2d 237, 242-243:
"Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator. In discharging responsibilities, an agency is 'clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication [citations omitted]. Where an agency has been endowed with broad power to regulate in the public interest, we have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme’ [Matter of City of New York v State of New York Commn. on Cable Tel., 47 NY2d 89, 92]. It is correspondingly axiomatic, however, that an administrative officer has no power to declare through administrative fiat that which was never contemplated or delegated by the Legislature. An agency cannot by its regulations effect its vision of societal policy choices [Matter of Consolidated Edison Co. v Department of Envtl. Conservation, 71 NY2d 186, 191-192; Boreali v Axelrod, 71 NY2d 1, 9], and may adopt only rules and regulations which are in harmony with the statutory responsibilities it has been given to administer.”).
The majority, without analyzing title 7’s place in the overall scheme of ECL article 33, has invested the Commissioner with the very power being contested today, even while relying on case law that recognizes the need to examine the entire *405 enabling statute in instances where the scope of the agency’s legislatively prescribed authority is in doubt:
"It is well established that our task in interpreting separate provisions of a single Act is to give the Act 'the most harmonious, comprehensive meaning possible’ in light of the legislative policy and purpose. Clark v. Uebersee Finanz-Korp., [332 US 480, 488]; see United States v. Bacto-Unidisk, 394 U. S. 784, 798.” (Weinberger v Hynson, Westcott & Dunning, 412 US 609, 631-632.)
In this case, the majority diminishes the significance of title 7’s legislative policy and purpose. In turn, it attributes inflated significance to title 3 on the ground that "the specific rule-making power to restrict or limit pesticide use under ECL 33-0303 (3) (d)” finds no statutory counterpart in FIFRA (majority opn, at 393). However, the majority proceeds from a flawed premise. FIFRA does indeed provide rule-making authority to ban pesticides.
7 USC § 136a (d) (2) provides:
"(2) Change in classification. If the Administrator determines that a change in the classification of any use of a pesticide from general use to restricted use is necessary to prevent unreasonable adverse effects on the environment, he shall notify the registrant of such pesticide of such determination at least [45] days before making the change and shall publish the proposed change in the Federal Register. The registrant, or other interested person with the concurrence of the registrant, may seek relief from such determination under section [136d (b)] of this title.”
The implementing regulation, 40 CFR 152.140, entitled "Classification of pesticide products”, provides:
"FIFRA sec. 3(d) authorizes the Agency, as part of the registration or reregistration of a pesticide, or by issuing a regulation, or by an order under FIFRA sec 6 [7 USC § 136d, which contains the cancellation authority and scientific review safeguards], to classify a product, its uses, or a class of products or uses for restricted use, in accordance with the criteria and procedures in subpart I of this part.” (Emphasis added.)
*406 40 CFR 152.160, which deals with the scope of classification of pesticides further provides in subdivision (b):
"Kinds of restrictions. The Agency may restrict a product or its uses to use by a certified applicator, or by or under the direct supervision of a certified applicator, as described in FIFRA sec. 3 (d) (1) (C). The Agency may also, by regulation, prescribe restrictions relating to the product’s composition, labeling, packaging, uses, or distribution and sale, or to the status or qualifications of the user.” (Emphasis added.)
Manifestly, the EPA is authorized to promulgate a regulation changing the classification of a pesticide from general to restricted use, thus restricting, or even banning, the use, sale or distribution of a pesticide product where there is a substantial question about its safety. This is exactly the course of action the Commissioner of DEC has pursued in this case. Thus, contrary to the majority’s observation, FIFRA and ECL are structurally parallel. The principal difference is that while FIFRA explicitly makes the EPA Administrator’s change of classification rule-making authority subject to the cancellation and scientific review procedures contained in 7 USC § 136d, title 3 is silent in this respect.
Evidently, the Legislature did not contemplate that a change of classification by title 3 rule making would in some cases automatically effect the cancellation of existing registrations for pesticide products. We have ample, highly persuasive authority to fill this vacuum — FIFRA, upon which ECL article 33 is modeled, and which provides for cancellation proceedings, including scientific review, when a pesticide is banned by rule. Title 3 and DEC’s own regulations provide that, for purposes of uniformity, FIFRA’s regulations must fill the gaps of New York’s statutory scheme (see, ECL 33-0303 [4]; 6 NYCRR 320.1 ["the rules and regulations applicable to and in conformity with the primary standards established by article 33 of the Environmental Conservation Law shall be those promulgated pursuant to (FIFRA)”]).
Indeed, the majority’s formulation works a conflict against FIFRA, and leaves New York’s Commissioner of DEC to resolve complex policy questions on the frontiers of scientific knowledge based only on the evidence developed at a generic public rule-making hearing. The Legislature, in adopting the remarkably detailed procedural requisites contained in title 7, *407 recognized that specialized expertise is required when making pesticide cancellation decisions. The risks to both registrants and the public at large attendant to the majority’s evisceration of title 7, which promotes agency accuracy, are manifest.
Our task in the face of legislative silence and ambiguity concerning the proper interplay of different provisions of a single act is to construe the provisions in a manner that furthers the over-all policy and purpose of the entire statute (see, Matter of Bookhout v Levitt, 43 NY2d 612, 617 [it is an "elementary canon of statutory construction that all parts of a statute be read and construed together to determine legislative intent”]). Titles 3 and 7 are important components of a single, integrated statutory scheme embodying a balanced risk/benefit approach to pesticide regulation. The two provisions can and should be construed harmoniously in the context of article 33 as a whole. Consequently, we cannot join in the executive-judicial excision of the Legislature’s carefully constructed framework for informed resolution of complex scientific policy questions. The majority’s resolution, premised on automatic deference to generic rule-making authority, is simply unsound.
In our view, the majority also errs in repealing title 7 by implication. In Matter of Consolidated Edison Co. v Department of Envtl. Conservation (71 NY2d 186, 195), we stated:
"Generally, a statute is not deemed impliedly modified by a later enactment ' "unless the two are in such conflict that both cannot be given effect. If by any fair construction, a reasonable field of operation can be found for [both] statutes, that construction should be adopted” ’. 'These principles apply with particular force to statutes relating to the same subject matter, which must be read together and applied harmoniously and consistently’ ” ([emphasis added and citations omitted]; see, McKinney’s Cons Laws of NY, Book 1, Statutes § 391; Matter of Natural Resources Defense Counsel v New York City Dept. of Sanitation, 83 NY2d 215, 222-223).
We are unable to accept the other major premise supporting the majority’s holding — that the complex science policy issues implicated by the DEBT concentration rule were somehow adequately "litigated” during the public rule-making hearing. The rule-making hearing which the majority considers suffi *408 cient for resolution of the issues implicated by the DEBT rule is but an informal process whereby the public is provided with notice of the terms or substance of the agency’s proposal; the public is given an opportunity to comment on the proposal; and the agency then provides its reasons for adopting its final rule together with its responses to the public comments.
In this case, registrants, manufacturers and other agencies were also invited to submit comments on the proposed rule. However, the public hearing lasted 1 hour and 45 minutes. Eight people testified in favor of continued availability of high concentration DEBT products, and the only person speaking in favor of the DEBT rule at the meeting was DEC’S representative, who was not subject to cross-examination. In short, there was never a true opportunity to "litigate” in this case, i.e., to probe and test the scientific evidence supporting the DEBT rule, including the potential adverse effects on the Lyme Disease epidemic attendant to depriving the public of the highest concentrations of the only effective repellant against the ticks which spread the disease.[4] Nor did the Commissioner’s informal rule-making hearing elicit the independent and comprehensive technical input the Legislature has stated is necessary for informed cancellation decisions under article 33.
It must be kept in mind that the procedural requisites at issue in this case are conceptually unique. The Commissioner is not just resolving disputed factual issues through rule making. The Commissioner is deciding complex, mixed questions of science and policy that require balancing the environmental, social, and economic costs and benefits of continued use of high concentration DEBT products. The science advisory apparatus assists the Commissioner in this difficult process, providing it with technical input from an expert, neutral body, thus ensuring that the Commissioner’s DEBT cancella *409 tian decision is premised on adequate data and embodies coherent public policy.
It is clear that title 7’s express, preexisting, statutory procedural safeguards are of a completely different nature and historical development than the generic "due process” hearing rights at issue in the cases relied upon by the majority (see, e.g., Mobil Oil Exploration v United Distrib., 498 US 211, supra ["due hearing”]; Heckler v Campbell, 461 US 458 [Social Security disability hearing]).
In summary, we reject the majority’s reading of article 33, which virtually eliminates the core of title 7 — scientific review —and reduces cancellation proceedings to a pro forma rubber stamping process in those instances where DEC has promulgated a rule requiring the cancellation of registrations. We would hold that, although the Commissioner may promulgate a regulation completely restricting the use of a pesticide, it must also satisfy title 7’s scientific review requirements when cancelling existing pesticide registrations not in compliance with the proposed rule.
Our construction of what the Legislature intended and enacted would not impede the Commissioner’s ability to protect the public safety. If DEC concludes that the public or environment are imminently threatened by continued use of a pesticide, under the explicit terms of title 7, DEC may immediately suspend registrations for products containing that pesticide pending completion of cancellation proceedings (ECL 33-0719). Nor would we subordinate title 3 to title 7. Rather, in light of the important but potentially conflicting interests embodied by the two provisions, and the Legislature’s silence concerning their interplay, the preferred construction should be one that furthers the Legislature’s over-all approach to pesticide regulation, which places great value on reasoned, informed decision making (see, Matter of Bookhout v Levitt, 43 NY2d 612, supra). Under controlling principles of administrative law, DEC would continue to be entitled to judicial deference, even where the record is susceptible of conflicting inferences from the scientific evidence adduced. Finally, our construction would preserve harmony with FIFRA, which provides for scientific review and public hearings in all cancellation cases, including where, as here, a ban on a generic active ingredient requires mass cancellations of product registrations (cf., 7 USC § 136d [b]; 40 CFR 164.20; see, e.g., Love v Thomas, 858 F2d 1347; Environmental Defense Fund v Environmental Protection Agency, 465 F2d 528, 532).
*410 SEQRA
The Commissioner of DEC violated SEQRA in issuing a negative declaration. The Appellate Division rejected petitioners’ argument, stating merely that "the record establishes that the Commissioner identified the relevant areas of environmental concern, took a 'hard look’ at them and made a reasoned elaboration for the determination (see, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359).” (197 AD2d, at 319.) However, this conclusion is without support in our case law (see, Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417; Matter of Har Enters. v Town of Brookhaven, 74 NY2d 524, 528-529). DEC failed to take a "hard look” at the ramifications of the DEBT rule on Lyme Disease prevention.
The primary purpose of SEQRA is "to inject environmental considerations directly into governmental decision making” (Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d 674, 679). Under SEQRA, DEC was required to make an initial determination whether the DEBT regulation "may have a significant effect on the environment” (ECL 8-0109 [2] [emphasis added]). If so, DEC was required to prepare an Environmental Impact Statement. It is settled that "[t]he threshold at which the requirement that an EIS be prepared * * * is relatively low: it need only be demonstrated that an action may have a significant effect on the environment” (Chinese Staff, supra, at 364-365 [emphasis added]; Onondaga Landfill Sys. v Flacke, 81 AD2d 1022; Weinberg, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 ECL 8-0109, at 75).
In this case, medical and entomological experts opined that the DEBT rule would limit the availability of DEBT concentrations most effective against Lyme Disease (see, e.g., record on appeal, at 747-748 [statement of Dr. Durland Fish]; id., at 396 [statement of Dr. Kenneth Leigner, a physician specializing in Lyme Disease]). Dr. John A. Mulrennan, the Chief of the Bureau of Entomology and Pest Control of the Florida Department of Agricultural and Consumer Services, and one of the authors of a 1969 Vietnam DEBT study upon which DEC relies in support of its rule, stated:
"it would be a mistake to limit the public to less than the most effective formulation of DEBT available, particularly if you’re basing your concerns on the research conducted by Dr. Lamberg and myself [involving 75% DEBT concentrations in combat conditions]. * * * *411 "The cases of [Lyme Disease and Eastern Encephalitis] are a real health problem. They pose significant risks to the public. Any public health threat posed by the use of DEBT repellents pales by comparison” (record on appeal, at 457-458 [emphasis added]).
The authoritative statements in the record point out the magnitude of the very tangible public health threat presented by Lyme Disease. The record also reveals the current paucity of scientific knowledge concerning the tick-repelling-efficacy of DEBT. Because of the lack of adequate studies, it is unknown what concentrations of DEBT adequately protect humans against the ticks which spread Lyme Disease. DEC actually concedes this point and its lack of knowledge on the issue (see, Rep of Bureau of Toxic Substance Assessment of NY State Dept of Health, May 20, 1991, record on appeal, at 290). Nevertheless, DEC expects that it can issue a negative declaration in this case without conducting any preaction investigation of the potential adverse effects of removing high concentration DEBT products from the market.
Similar agency efforts to ignore key, disputed issues have repeatedly been rejected in the past (see, e.g., Matter of Golten Mar. Co. v New York State Dept. of Envtl. Conservation, 193 AD2d 742, 743 [DEC did not examine area of environmental concern]; Purchase Envtl. Protective Assn. v Strati, 163 AD2d 596, 597-598 [Town Planning Board violated SEQRA when it failed to make a "coherent evaluation” of wetlands; moreover, Board’s "hard look” obligation had to be made on the record and could not be delegated to expert consultants]; Matter of Desmond-Americana v Jorling, 153 AD2d 4, 10-11, lv denied 75 NY2d 709 [negative declaration violated SEQRA because DEC conducted only "cursory examination” of impact its regulations establishing comprehensive system for prior notification of pesticide applications in the commercial lawn context would have on existing integrated pest management system]; Matter of Save the Pine Bush v Planning Bd., 130 AD2d 1 [Planning Board did not consider key question of the minimal acreage required for continued survival of Pine Bush ecology]; H.O.M.E.S v New York State Urban Dev. Corp., 69 AD2d 222, 232 [UDC failed to analyze traffic and parking problems its project entailed]).
DEC’s obligation under the circumstances of this case was to perform a "thorough and meaningful review” (see, Matter of *412 Desmond-Americana v Jorling, 153 AD2d 4, 11; see also, Chinese Staff, supra, at 364). DEC conducted no such review. Despite the sharply disputed evidence in the record concerning the impact banning high concentration DEBT products would have on the incidence of Lyme Disease, and DEC’S conceded lack of knowledge on this issue, DEC answered the questions whether its action could result in any adverse environmental effects, or any controversies related thereto, with a single word — "No” (record on appeal, at 829). Later, in issuing a Revised Negative Declaration, DEC brushed aside with one conclusory sentence all of the authoritative statements and sharply disputed evidence pertaining to the possible increased danger of contracting Lyme Disease: "No increase in the incidence of vector-borne diseases is expected to result from this rule” (id., at 371).
In conclusion, DEC neither took a "hard look” at the relevant environmental concerns, nor made a reasoned elaboration of the basis for its declaration of nonsignificance (see, Chinese Staff, supra, at 364). Since DEC failed to satisfy SEQRA, the DEBT regulation should be annulled (see, Inland Vale Farm Co. v Stergianopoulos, 104 AD2d 395, 396, affd 65 NY2d 718; Desmond-Americana, supra, at 12).
Chief Judge Kaye and Judges Simons, Titone and Smith concur with Judge Levine; Judge Ciparick dissents in a separate opinion in which Judge Bellacosa concurs.
Order affirmed, with costs.

. As amended by DEC’s new rule, 6 NYCRR 326.2 provides:
"(b) The following may be distributed, sold, purchased, possessed or used only upon issuance of a commercial permit or purchase permit for those purposes listed: * * *
"(10) DEBT (N,N-diethyl-m-toluamide):
"(i) end use product formulations for use on humans are limited to concentrations of 30 percent or less DEBT active ingredient; except controlled-release formulations (formulations which contain one or more ingredients intended to regulate the rate of release of active ingredients) are limited to concentrations of 33.33 percent or less DEBT active ingredient; and (ii) all products are general use.”

. ECL 33-0301 declares the Legislature’s policy and purposes: "The purpose of this article is to regulate the registration, commercial use, purchase and custom application of pesticides. Pesticides, properly used for the control of insects, fungi, weeds and nematodes, and as defoliants, desiccants, and plant regulators and for related purposes, are valuable, important and necessary to the welfare, health, economic well-being and productive and industrial capabilities of the people of this state. However, such materials, if improperly used, may injure health, property and wildlife. It is hereby declared to be a matter of legislative determination that the regulation of the registration, commercial use, purchase and custom application of pesticides is needed in the public interest and that in the exercise of the police power all persons be required to register or obtain permits before engaging in such activities.”

. Article 33 classifies pesticide products as either "restricted use” or "general use”. Restricted use pesticides are defined as those which persist or accumulate in the environment and create a present or future risk of harm, or which "the commissioner finds is so hazardous to man or other forms of life that restrictions on its sale, purchase, use, or possession are in the public interest” (ECL 33-0101 [42] [b]).

. Title 7 is not a second bite at the apple given the procedural posture of this case. When registrants were invited to comment on the DEBT rule they were not informed that the rule-making hearing would be their one and only opportunity to challenge the substantive merits of the rule. As far as the registrants knew, they would still be entitled to title 7 review after the rule-making hearing. Thus, it is unpersuasive to posit that these registrants had an opportunity to fully litigate this issue. Had they known at the time of the rule-making hearing that the Commissioner intended to take the unprecedented step of foregoing title 7’s scientific review provisions in cancelling their registrations, the rule-making hearing would likely have proceeded differently.