UGI UTILITIES, INC., et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Columbia Gas Transmission Corporation, et al., Intervenors.

No. 97–1035.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1998.

Decided June 5, 1998.

Mary E. Baluss argued the cause for petitioners. With her on the briefs were Christopher J. Barr, Kent D. Murphy, Lawrence F. Barth, John F. Povilaitis and Denise Goulet. Frederick W. Peters, Michael W. Hall and Veronica A. Smith entered appearances.

Joel M. Cockrell, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, John H. Conway, Deputy Solicitor, and Susan J. Court, Special Counsel. Edward S. Geldermann, Janet K. Jones and Timm L. Abendroth, Attorneys, entered appearances.

James F. Bowe, Jr. argued the cause for intervenors. With him on the brief were Benga L. Farina, John H. Pickering, Joseph E. Killory, Jr., James L. Blasiak, Robert S. Fleishman, Andrew P. Mosier, Jr., Jennifer N. Waters, Stanley W. Balis, Elisabeth R. Myers–Kerbal, Kenneth E. Tawney, Marye L. Wright, Jonathan D. Schneider, James C. Beh, Richard J. Kruse, Henry S. May, Jr., Judy M. Johnson, Catherine O'Harra, Jeffrey A. Gollomp, Peter C. Lesch, John K. Keane, Jr., Telemac N. Chryssikos and Paul S. Buckley.

Before: GINSBURG, RANDOLPH and TATEL, Circuit Judges.

TATEL, Circuit Judge:

As a result of the Federal Energy Regulatory Commission's restructuring of the natural gas industry, petitioner, a natural gas company, lost the no-notice service it claims it had received from an interstate pipeline. FERC rejected petitioner's requests to require the pipeline to provide it with no-notice service and for mitigation. Because we find nothing unreasonable in FERC's decisions, we deny the petition for review.

I

Unlike most interstate natural gas pipelines serving the northeast, which have facilities near the nation's major sources of natural gas in the Gulf of Mexico and the Southwest, the Columbia Gas Transmission

Corporation—known as a "downstream pipeline"—has no direct connections with these sources. Columbia maintains facilities only in Appalachia. Prior to FERC's restructuring of the natural gas industry in Order 636,[*] Columbia received most of its gas supply from the Texas Eastern Transmission Corporation and other "upstream pipelines" that transport gas from the Gulf and the Southwest for use by downstream pipelines.

Petitioner UGI Utilities, Inc. provides local retail natural gas service to residential, commercial, and industrial customers in central and eastern Pennsylvania. Before restructuring, Columbia delivered gas to UGI at thirty-eight delivery points. Because Columbia had no physical facilities at nine of these delivery points, Texas Eastern delivered gas directly to UGI at these points for Columbia's account. Through a combination of Texas Eastern's capacity and the use of various storage, balancing, and dispatching arrangements, Columbia provided UGI with what UGI claims was "no-notice" service—a type of firm transportation service which allows customers to receive gas whenever they need it—at these nine points.

Determining that downstream pipelines possessed competitive advantage over other gas merchants because they held substantial capacity rights on upstream pipelines, FERC's Order 636 required downstream pipelines to assign their capacity on upstream pipelines directly to their customers "to the extent necessary to provide capacity to those [customers] that desire upstream capacity." Order No. 636, ¶ 30,939, at 30,417; see also 18 C.F.R. § 284.242 (1997) ("An interstate pipeline that offers transportation service on a firm basis ... must offer without undue discrimination to assign to its firm shippers its firm transportation capacity ... on all upstream pipelines...."). For example, if a downstream pipeline had contracted with an upstream pipeline to transport gas from the Gulf of Mexico through the downstream pipeline's facilities, which would then transport the gas to its customers, Order 636 now requires the downstream pipeline to assign its capacity on the upstream pipeline directly to those customers. The downstream pipeline's customers would then, as FERC describes it, "step into the shoes" of the downstream pipeline. A downstream pipeline may, however, retain some of its upstream capacity by demonstrating that it needs the capacity either for operational reasons or to provide no-notice service. Order No. 636–A, ¶ 30,950, at 30,566–67.

Pursuant to Order 636, Columbia proposed to reassign all its capacity on upstream pipelines directly to its thirty-seven customers, including UGI. Central to this case, it proposed to assign to UGI the capacity it held on Texas Eastern at the nine intersection points. This meant that Columbia could no longer combine its old Texas Eastern service with its other storage and balancing arrangements to provide UGI with the type of service it previously provided. As a substitute, UGI purchased no-notice service directly from Texas Eastern, a service it claims is less flexible and more expensive than the service received prior to Order 636.

Over UGI's objections, FERC approved Columbia's restructuring as "consistent with Order 636." *Columbia Gas Transmission Corp.*, 64 F.E.R.C. ¶ 61,060, 61,512, *reh'g denied*, 64 F.E.R.C. ¶ 61,365, 63,507–08, *reh'g denied*, 65 F.E.R.C. ¶ 61,344, 62,734 (1993). It also rejected UGI's claim for mitigation, noting that "mitigation in Order No. 636 applies only to shifts caused by use of the SFV methodology," *id.* at 61,512–13, as well as its challenges to Texas Eastern's study which demonstrated that the cost shift to UGI caused by the use of SFV amounted to less than the ten percent required by Order 636 before a customer is entitled to mitigation. *Texas Eastern Transmission Corp.*, 63 F.E.R.C. ¶ 61,100, 61,421–24, *reh'g denied*, 64 FERC ¶ 61,305, 63,257–58 (1993).

---

[*] Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Wellhead Decontrol, Fed. Energy Reg. Comm'n Stats. & Regs. [Regs. Preambles 1991–1996] (CCH) ¶ 30,939, *order on reh'g*, Order No. 636–A, Fed. Energy Reg. Comm'n Stats. & Regs. [Regs. Preambles 1991– 1996] (CCH) ¶ 30,950, *order on reh'g*, Order No. 636–B, 61 F.E.R.C. ¶ 61,272 (1992), *reh'g denied*, 62 F.E.R.C. ¶ 61,007 (1993), *aff'd in part and remanded in part*, *United Distrib. Cos. v. FERC*, 88 F.3d 1105 (D.C.Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997) ("*UDC*").

UGI now petitions for review of FERC's decisions. A second group of petitioners—the Pennsylvania Public Utility Commission and the Pennsylvania Office of Consumer Advocate—also argues that FERC acted arbitrarily and capriciously by approving Columbia's restructuring proposal even though Columbia failed to inform the state agencies of certain meetings Columbia held with its customers prior to announcing its proposal.

## II

■ The central question in this case is whether FERC violated Order 636 or otherwise acted arbitrarily and capriciously by allowing Columbia to assign its capacity on Texas Eastern directly to UGI, thereby depriving UGI of the alleged no-notice service previously provided by Columbia. Pointing to language in Order 636, see Order No. 636, ¶ 30,939, at 30,411, 30,424–25, and to one of Order 636's implementing regulations, see 18 C.F.R. § 284.8(a)(4) ("An interstate pipeline that provided a firm sales service on May 18, 1992, and that offers transportation service on a firm basis ... must offer a firm transportation service under which firm shippers may receive delivery up to their firm entitlements on a daily basis without penalty."), UGI argues that because Columbia provided no-notice service to UGI before Order 636, FERC must require Columbia to provide the same no-notice service to UGI now. Denying that Columbia ever provided no-notice service to UGI, FERC responds that it already resolved this issue in Order 636–B, interpreting Order 636 as follows:

The Commission clarifies that upstream pipelines need to provide no-notice transportation service only to those customers to whom they provided no-notice service on May 18, 1992, and to the capacity assignees of those customers under section 284.242 of the Commission's regulations.... In short, the assignees of the downstream pipeline step into its shoes for this purpose when they take the capacity on the upstream pipeline.

. . . .

With respect to the scenario described by Brooklyn and UGI, where each bought gas from one pipeline but took delivery from another pipeline, the Commission interprets no-notice to mean that Brooklyn

Union and UGI are entitled to no-notice service from the delivering pipeline (i.e. Transco and Texas Eastern), if the delivering pipeline was contractually obligated to deliver the gas to them on a no-notice basis on May 18, 1992.

Order No. 636–B, ¶ 61,272, at 62,008. Relying on this passage, FERC argues that because Texas Eastern provided no-notice service to neither Columbia nor UGI prior to Order 636, UGI has no entitlement to no-notice service after Order 636.

FERC's position in both Order 636–B and this case—that a customer of a downstream pipeline is only entitled to no-notice service if the upstream pipeline provided no-notice service to the downstream pipeline prior to Order 636—is entirely consistent with Order 636's general upstream capacity assignment scheme, which requires that the downstream pipeline's customers "step into the shoes" of the downstream pipeline. We find nothing in either Order 636 or its implementing regulations requiring FERC to ensure that customers continue to receive the same type of no-notice service at the same price from the same pipeline that they received prior to Order 636. In fact, FERC specifically provided that the mechanics of how the no-notice service will be provided on a particular pipeline must be considered in the individual restructuring proceedings established by Order 636. See Order No. 636, ¶ 30,939, at 30,410. Because everyone agrees that Texas Eastern did not provide no-notice service to Columbia prior to Order 636, we believe that FERC has interpreted its regulations reasonably and thus defer to its decision not to require Columbia to provide no-notice service to UGI. See Northern Border Pipeline Co. v. FERC, 129 F.3d 1315, 1318 (D.C.Cir.1997) (court " 'afford[s] substantial deference' " to FERC's interpretations of its own regulations unless " 'plainly erroneous or inconsistent with the regulation[s]' " (quoting Bluestone Energy Design, Inc. v. FERC, 74 F.3d 1288, 1292 (D.C.Cir.1996))).

■ We are equally unpersuaded by UGI's argument that it should receive mitigation for the increased costs it incurred as a result of the reassignment. Order 636 requires mitigation only when the shift to SFV

results in a cost increase of more than ten percent. Order No. 636, ¶ 30,939, at 30,436 ("If the comparison shows that adopting SFV for cost allocation and rate design will result in a 10 percent or greater increase in revenue responsibility for any customer class, the Commission will require the pipeline to develop and implement a plan to phase-in any such rate increase over no more than four years."); *see also UDC,* 88 F.3d at 1128–29 (describing FERC's requirement that pipelines shift from the previously-used MFV rate design to SFV). Relying on Texas Eastern's mitigation study, which showed that UGI's actual increase in revenue responsibility would only amount to 9.61%, FERC denied UGI mitigation. *Columbia Gas Transmission Corp.,* 64 F.E.R.C. at 63,257. We find FERC's decision both reasonable and supported by substantial evidence. Although UGI objected to various aspects of Texas Eastern's study, including its use of a seventy-seven percent load factor instead of UGI's proposed thirty percent load factor, *see Columbia Gas Transmission Corp.,* 63 F.E.R.C. at 61,424, FERC adequately addressed these objections and gave a reasoned explanation for its acceptance of Texas Eastern's study. *See id.* (rejecting the proposed thirty percent load factor as "significantly understated"); *Columbia Gas Transmission Corp.,* 64 F.E.R.C. at 63,257 (rejecting UGI's argument that Texas Eastern's study is flawed because the study treated UGI's 1992 interruptible transportation volumes as firm). FERC also rejected, again reasonably, UGI's argument that FERC take into account all costs incurred by UGI as a result of Columbia's restructuring proceeding. *Id.* According to Order 636, the mitigation inquiry turns only on the shift to SFV and not on other costs resulting from Order 636. *See* Order No. 636, ¶ 30,939, at 30,436 ("This test applies only to cost shifts due to the change to SFV. Rate changes attributable to other aspects of this rule are not to be considered in determining whether a cost shift is 10 percent or greater.").

■ UGI next argues that under section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b) (1994), it was entitled to a hearing and a "reasoned decision that the abandonment was required by the public convenience and necessity" before FERC could allow Co-

lumbia to abandon UGI's no-notice service. We disagree. FERC adequately met its section 7(b) obligations by deciding in Order 636 that direct assignment of upstream capacity to the customers of downstream pipelines served the public interest by improving competition in the natural gas industry. No further hearings were required. *See Panhandle Eastern Pipe Line Co. v. FERC,* 907 F.2d 185, 188 (D.C.Cir.1990) (discussing section 7(b) and noting that "the Commission may use a rulemaking to identify circumstances where the public interest will be served by a particular consent, and then limit the scope of later adjudications to (1) whether those circumstances are present, and (2) where appropriate, whether any special factors in the particular case make the general rule inapplicable").

■ UGI claims that FERC violated section 5(a) of the NGA, 15 U.S.C. § 717d(a), by rejecting UGI's proposed alternative to Columbia's restructuring—the so-called "Upstream Delivery Service" ("UDS") system, which would have allowed Columbia to retain its upstream capacity—and by allowing Columbia to assign its capacity on Texas Eastern to UGI. Section 5(a) provides that:

[w]henever the Commission ... shall find that any rate, charge, or classification ... or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed.

*Id.* According to UGI, UDS is not "unjust, unreasonable, unduly discriminatory, or preferential." But FERC concluded that UDS would violate Order 636's requirement that downstream pipelines assign their capacity on upstream pipelines to their customers. *Columbia Gas Transmission Corp.,* 64 F.E.R.C. at 63,508. Given our deference to FERC's interpretation of its own orders, this conclusion seems completely reasonable.

■ Finding petitioner's remaining arguments to be without merit, we deny its petition for review. We also deny the state agencies' petition. Because these petitioners

enjoyed full participation in the proceedings before FERC, we cannot say that Columbia's failure to include them in all negotiations leading up to the announcement of Columbia's restructuring proposal renders FERC's approval of that proposal arbitrary and capricious.

*So ordered.*